# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

## Walter R. Hines v. Commonwealth.

### June 14, 1923.

Absent, Burks, J.

1. Homicide—*Evidence—Flight—Evading Arrest—Case at Bar.*—On a trial for homicide, where the conviction depended wholly on circumstantial evidence, it would seem only fair to allow the prisoner to repel, if he could, the effect which the jury would perhaps very naturally have attached to the circumstance that he appeared to be evading arrest. Thus, in the instant case, testimony to the effect that the prisoner after the homicide failed to surrender because dissuaded by his brother, who, on advice of counsel, thought it best to defer the surrender until the judge of the trial court, who was absent, should return to the city, was admissible.

2. Homicide—*Evidence Sufficient to Sustain Conviction of Murder in the Second Degree—Case at Bar.*—In the instant case, a prosecution for killing a police officer, a cap was found near where the officer fell, which was positively identified as one belonging to the accused by some of the witnesses, though their evidence was of itself not entirely free from impeachment, and the accused denied ownership of the cap and introduced evidence corroborating his denial. The bullets which caused the death of the deceased appeared to have been fired from a pistol like the one traced to the possession of the accused. From the evidence the jury might well have believed that he was in the vicinity of the crime and had the opportunity to commit it, and it was shown that he was in the city. It was shown that he was evading arrest; that he understood that police officers, including the deceased, were looking for him; and that he had made threats against the officers in general, and the deceased in particular.

   *Held:* That it could not be said that the evidence was not sufficient to sustain a conviction of murder in the second degree:

3. New Trials—*Homicide—After-Discovered Evidence—Case at Bar.*—Accused was convicted of the homicide of a policeman. The conviction was based principally upon motive, opportunity, possession of a pistol like the one used to kill deceased, the ownership by accused of a cap found at the scene of the crime, and threats against the police. Accused moved for a new trial on the ground of after-discovered

evidence, which tended to show that the cap belonged to a third party, a bootlegger who had threatened the police, who had a similar gun, a similar motive, and a similar opportunity, and who, in addition to these circumstances, had admitted to several persons that he, and not the accused, had committed the crime.

*Held:* That a new trial should have been granted, especially as the evidence at the trial showed that just after the shooting a man was seen to run from the scene of crime who was a larger man than the accused, but about the size of the third party.

4. NEW TRIALS—*After-Discovered Evidence—Admissibility of Testimony.*— Facts which if known at the time of the trial would have been inadmissible as evidence, are not grounds for a new trial, but if admissible they are grounds for such trial.

5. NEW TRIALS—*After-Discovered Evidence—Guilt of a Third Party—Admissibility of Testimony—Case at Bar.*—Accused was convicted of the homicide of a policeman. The conviction was based principally upon motive, opportunity, possession of a pistol like the one used to kill deceased, the ownership by accused of a cap found at the scene of the crime, and threats against the police. Accused moved for a new trial on the ground of after-discovered evidence, which tended to show that the cap belonged to a third party, a bootlegger who had threatened the police, who had a similar gun, a similar motive, and a similar opportunity, and who, in addition to these circumstances, had admitted to several persons that he, and not the accused, had committed the crime. The admissibility of the evidence set up in the affidavits was challenged on the ground that there was nothing to connect the third party with the crime.

*Held:* That the after-discovered evidence, if believed, as closely connected the third party with the crime as the accused.

6. NEW TRIALS—*After-Discovered Evidence—Guilt of a Third Party—Admissibility of Testimony.*—The conduct and declarations of a third party prior to a homicide are admissible to show that such third party, and not the accused, was the perpetrator of the homicide.

7. NEW TRIALS—*After-Discovered Evidence—Cumulative Evidence—Homicide—Case at Bar.*—After-discovered evidence, which is specific and circumstantial upon a doubtful point, and if true is such as would probably, if not necessarily, produce a different result, is not merely cumulative. Thus, in the instant case, where a cap found at the scene of crime was identified as belonging to accused, after-discovered evidence that the cap belonged to a third party, who had the same motive and opportunity to commit the crime as accused, and who had admitted to several persons that he was the guilty party, is not merely cumulative.

8. CRIMINAL LAW—*Evidence—Extra Judicial Confessions or Admissions of a Third Party that he Committed the Crime—Stare Decisis.*—While the

authorities are almost unanimous in holding that confessions of third parties made out of court are not admissible as tending to exonerate the accused, because such evidence would violate the rule against hearsay, yet as the reasons given by the authorities for rejecting proof of such evidence se m unsatisfactory and entirely arbitrary, and no rule of property being involved, the Supreme Court of Appeals thought it not too late to abandon the old rule and follow the rule of right and reason, under which such confessions would be admissible, especially as it was not hampered by any adverse decisions in Virginia.

9. CRIMINAL LAW—*Evidence—Extra Judicial Confessions or Admissions of a Third Party that he Committed the Crime—Case at Bar.*—In the instant case accused was convicted on circumstantial evidence of homicide and sought a new trial on the ground of after-discovered evidence, to the effect that a cap found near the scene of the crime and identified at the trial as belonging to accused really belonged to a third party, who had a pistol like the one used to kill deceased, who had the same opportunity and motive for killing deceased as accused, and who had admitted during his last illness to others that he, and not accused, had killed deceased. The Commonwealth objected that the confessions of this third party made out of court were not admissible to exonerate accused.

*Held:* That while the Supreme Court of Appeals was disposed to think that the evidence of even a bare confession by a deceased or unavailable witness ought to go to the jury for what they might consider it worth, yet as its decision holding the confession admissible must be regarded as out of line with the current of authority, it would expressly limit its effect as a precedent to the particular facts of the case in hand.

10. HEARSAY EVIDENCE—*Exceptions to the Rule—Declarations Against Interest—Extra Judicial Confessions of Crime.*—Hearsay evidence is excluded, because it lacks the sanction of an oath and the test of cross-examination, and facilitates the use of perjured evidence. One of the exceptions to this rule is that relevant declarations against interest, where the declarant has since died or otherwise become unavailable as a witness, are receivable in evidence. While it had been held that this exception does not include a statement of facts subjecting the declarant to criminal liability, but must be confined to declarations against pecuniary or proprietary interests, there seems to be no reason for making a difference between these two classes of cases. Every reason which justifies the exception in the latter case justifies it in the former.

11. DECLARATIONS AND ADMISSIONS—*Truth and Credibility for the Jury.*— The truth of an admission itself, and the credibility of the witness who undertakes to repeat the admission, must, like the truthfulness of all other testimony, address itself to and be settled by the jury.

12. CRIMINAL LAW—*Evidence—Broad Rule of Admissibility.*—Although much must be left to the discretion of the trial court, where the determination of a fact depends upon circumstantial evidence, the safe, practical rule to follow is that in no case is evidence to be excluded of facts or circumstances connected with the principal transaction, from which an inference can be reasonably drawn as to the truth of the disputed fact.    Instead of withholding any available information by the application of rigid rules of exclusion "the more excellent way" is to admit all testimony which will enlighten the triers of fact in their quest for the truth.    The better view is, not how little, but how much, logically competent evidence is admissible.

13. NEW TRIALS—*Criminal Law—After-Discovered Evidence—Materiality of the Evidence.*—On a motion for a new trial on the ground of after-discovered evidence, if the evidence as actually introduced at the trial was conclusive of the guilt of the accused, then the after-discovered evidence might be ignored.    But if the vital facts upon which the verdict was based were disputed, and the new evidence, if the jury had heard and believed it, would necessarily have produced a different result, then a new trial should be granted.

14. APPEAL AND ERROR—*New Trial—Use of Discussion of the Evidence by the Appellate Court at a New Trial.*—Where it was necessary for the Supreme Court of Appeals, on an application for a new trial on the ground of after-discovered evidence, to discuss the evidence in the case, both the old and the new, nothing said in the discussion should be used before the jury on another trial on the question of the weight or credibility of the testimony, or as to the actual guilt or innocence of the accused.

Error to a judgment of the Hustings Court, Part II of the city of Richmond.

*Reversed.*

The opinion states the case.

*J. M. Turner* and *L. O. Wendenburg,* for the plaintiff in error.

*John R. Saunders, Attorney General, J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the Commonwealth.

KELLY, P., delivered the opinion of the court.

Walter R. Hines was indicted for the murder of W. I. Curtis, a police officer of the city of Richmond. The jury found him guilty of murder in the second degree, fixing his punishment at confinement in the penitentiary for a term of fifteen years. The trial court pronounced judgment upon him in accordance with the verdict, and to that judgment this writ of error was awarded.

There are eight assignments of error, all of which have been carefully considered, but we shall discuss only two of them. As to the others it is enough to say that some of them involve questions which are not likely to arise at another trial, and as to all of them the action of the trial court was plainly right. They present no points of interest or difficulty, and do not warrant a review by this court.

[1] 1. At the time of the homicide the accused was keeping himself in hiding from the police officers of the city of Richmond to avoid arrest for a second offense against the prohibition law; and he remained in hiding after officer Curtis was killed until he was discovered and arrested. At the trial he sought to prove that after learning that he was being charged with the murder he wanted to surrender himself to the officers at once in answer to that charge, and was dissuaded from doing so by his brother, who, upon advice of counsel, thought best to defer the surrender until Judge Wells of the trial court, who was then out of the city, could be consulted. The court refused to admit this evidence, and the prisoner excepted.

The Commonwealth does not appear to have laid any particular stress upon the fact, if it was a fact, that the accused evaded arrest for the murder, and no instruction was asked for or given upon that point. If there were no other error in the case, the refusal to allow the

prisoner to introduce, for what the jury might have thought it worth, his alleged reason for remaining concealed, would hardly warrant a reversal of the judgment. We think it would have been better, however, if the court had admitted the evidence in question. The conviction depended wholly on circumstantial evidence, and it would seem only fair to allow the prisoner to repel, if he could, the effect which the jury would perhaps very naturally have attached to the circumstance that he appeared to be evading arrest. If this evidence is offered at another trial, it ought to be admitted. See *Lewallen* v. *State*, 33 Tex. Cr. R. 412, 26 S. W. 832.

[2] 2. The more serious question in the case arises upon the action of the court in refusing to set aside the verdict and award a new trial for after-discovered evidence. The motion for a new trial was also based on the alleged insufficiency of the evidence, as actually introduced, to sustain a conviction, but we do not understand this branch of the motion to be seriously pressed.

The killing occurred shortly after two o'clock a. m., August 22, 1921, in a vacant lot in South Richmond. The deceased was shot three times in rapid succession with a thirty-eight calibre pistol, and instantly killed. A number of witnesses heard the shots and one of them saw the flash from the pistol, but it is not claimed that there were any eye-witnesses to the shooting or that anybody recognized the perpetrator. Several persons went to the scene at once, and various members of the police force arrived in a few moments.

The evidence as to the condition of the ground tended to show that the deceased and his adversary had been engaged in a struggle. A cap was found near where he fell, which some of the witnesses for the Commonwealth undertook to positively identify as one belonging to the accused, but their evidence was of itself not entirely

free from impeachment, and the accused denied ownership of the cap, and introduced certain evidence tending to corroborate his denial. The conclusiveness of the identification depended upon the weight and credibility of the testimony.

The bullets which caused the death of the deceased appeared to have been fired from a pistol like the one traced to the possession of the accused. It was shown that he was in Richmond that night, and the jury might well have believed from the evidence that he was in the vicinity of the crime and had the opportunity to commit it. It was also shown that he was evading arrest for a second violation of the prohibition law (a felony); that he understood that the police officers, including the deceased, were looking for him; and that he had made threats of violence against such officers in general, and against the deceased in particular.

Under these circumstances, which were elaborated at very great length in the testimony, we could not say that the evidence was not sufficient to sustain the conviction. It was for the jury to decide whether the facts were established, as claimed by the Commonwealth, to the exclusion of a reasonable doubt. The ownership of the cap was the most vital circumstance, and under the evidence which they heard they might well have been thoroughly satisfied that the cap belonged to the accused.

[3] The difficulty in the case arises upon the alleged after-discovered evidence, and that evidence as we shall see, if credited by the jury, would have changed their view, not only as to the ownership of the cap, but also as to the weight to be given to the possession by the accused of a thirty-eight calibre pistol and the motive and opportunity which he was shown to have had for the commission of the crime. To be more specific, the al-

leged after-discovered evidence tended to show that the cap belonged to a third party, who had a similar gun, a similar motive and a similar opportunity, and who, in addition to these circumstances, admitted to several persons that he, and not the accused, had committed the crime.

To properly appraise the materiality of the alleged after-discovered evidence, it is important to have in mind certain facts disclosed at the trial and not heretofore mentioned. It was shown by the testimony that just after the shooting a man was seen to run from that direction and disappear. He was a larger man than the accused. This circumstance was called to the attention of the officer directing the investigation at the scene of the murder a short time after the shooting, but his suspicions had already settled upon the accused and he apparently did not attach much importance to this incident. In answer to a suggestion that it might be well to examine the tracks of the man who had been seen to run away, or use blood hounds on his trail, the officer replied, according to the version given by the witness: "Oh, H—l; it is nobody but Walter Hines." The witnesses who saw this man running away were not sure whether he wore any headgear, but they did not think he was the accused.

The verdict in this case was rendered on the 23rd day of January, 1922, and on that day a motion for a new trial was made and taken under advisement by the court. On April —, 1922, the accused added to the grounds of his motion the allegation of after-discovered evidence, and filed numerous affidavits in support of such ground, setting up the following facts:

One Curtis Jenkins, a resident of Richmond, died in February, 1922. He was a larger man than Walter Hines. He was a bootlegger and had said that no offi-

cer could ever carry him alive to the police station again, and that "before he would let an officer take his whiskey from him that he or the officer would wear a wooden overcoat, meaning a coffin." He had at least one customer for whiskey in the neighborhood of the crime; and he knew the police officers were trying to arrest him for a violation of the prohibition law. He usually carried a thirty-eight calibre pistol, and wore a cap like the one found at the scene. He left home with a pistol on the night of the killing, was out all night, came to his brother's house about three or four o'clock that morning intoxicated and bareheaded, said he had lost his cap, and he borrowed a hat from his brother. He told another affiant early that morning that he had been in a fight that night and lost his cap. He asked the last named affiant if he had heard that officer Curtis had been killed, and on being asked by affiant if he had killed him, said he did not do it. About eleven o'clock on the morning after Curtis was killed, Jenkins went to the home of his sister-in-law, Mrs. Floyd Jenkins, and asked for a cup of coffee. He did not have on the same cap which he had been wearing and said he had left the old one in the city. About a month later he came to the house of this lady and asked for a loan of $100.00. On being asked what he wanted with it, he said he wanted to leave the country and save himself from the electric chair, and when he was questioned further said: "Oh, well, if you will not let me have it I might as well go on to jail." When the jury's verdict was returned in this case Curtis Jenkins and his brother, Raymond Jenkins, were outside of the court room, and Curtis said to Raymond: "It was a da—n shame he had to pull fifteen years for that crime—that he was not guilty." During the trial he said to another affiant that "he could swear that Walter Hines never killed officer Curtis." Two

nights before Curtis Jenkins was taken sick he was playing cards with James Nunnally, and at that time exhibited a thirty-eight calibre pistol and said to Nunnally: " 'I have something to tell you if you will promise me — to tell anybody,' and I told him I would not and asked him what it was, and he said, 'I killed policeman Curtis and for God's sake don't tell anybody,' and I promised him I would not, and he then said, 'It is another one I want to kill,' and I asked him who it was, and he said Pete Anthony, and I asked him what he wanted to kill him for, and he said, 'Because he shot at me twice while I was going through Fonticello Springs with two gallons of whiskey.' "

After officer Curtis was killed, Jenkins, who had not theretofore been a heavy drinker, drank heavily, and on being warned by a friend against such excess, said: "It is not corn liquor but something on my mind which is worrying me."

During his last illness he said to Mrs. Bessie Jenkins, about the time she was preparing to give him some medicine: "I killed that man and Hines did not," and then "he pointed and tapped his chest with his finger." About the same time he made a similar statement to his brother, Fred Jenkins, whose account of the confession was as follows: "Curtis was taken sick and I was in the room where he was, and he asked me if I wanted a drink of whiskey, and I told him I didn't care, he had a hole in the floor where he kept his whiskey, and I took a drink and put the whiskey back in there, he asked me if he told me something if I could keep it under my hat, I told him I could; he told me that he killed policeman Curtis and Pete Hines did not have a thing to do with it, he said, 'Don't you tell a soul about it.' "

It seems clear to us that the evidence set out in the affidavits as detailed above was both relevant and ad-

missible. It is said in the brief that no foundation was laid for the introduction of the alleged confessions as dying declarations. That is true. They were not offered as such, were not admissible as such, and that question is out of the case. Their admissibility, as we shall see, depends upon other considerations.

[4] There seems to be no contention that the accused could have discovered the alleged new evidence before the trial. It is said in the brief for the Commonwealth that if the facts stated in the evidence had "been known at the time of the trial, they would have been inadmissible as evidence in the case, and therefore they are clearly not grounds for a new trial." This quotation embodies a fair test of the question whether the affidavits in this case warranted the granting of a new trial, but we are of opinion that this test indicates a different result from that which is contended for by the Commonwealth.

The principal grounds upon which the admissibility of the evidence set up in the affidavits is challenged seems to be: (1) That there was nothing to connect Curtis Jenkins with the crime; (2) that as to the cap, the evidence was merely cumulative and corroborative of other evidence of the accused tending to show that the cap did not belong to him, and (3) the broad proposition that evidence of confessions by a third party are never admissible in criminal trials for the purpose of exonerating the accused.

[5, 6] We are unable to give our assent to either of these propositions. If the cap belonged to Jenkins—and surely there is reason to contend that it did—he was about as closely connected with the crime as the accused. He was a bootlegger on the outlook for the officers; he had threatened the police officers of Richmond as a class; he knew they were trying to apprehend him;

he had a thirty-eight calibre pistol; he was out that night; he was about the size of the man who was seen to run from the place of the crime; and he turned up next morning without his cap and claimed that he had lost it in a fight. That the conduct and declarations of a third party prior to a homicide are admissible to show that such third party and not the accused was the perpetrator may be considered well settled in this State by the decision in the case of *Karnes* v. *Commonwealth*, 125 Va. 758, 99 S. E. 562, 4 A. L. R. 1509. Indeed, this is the well settled rule in other jurisdictions. See Freeman's note to *Blocker* v. *State*, 131 Am. St. Rep. at page 787, and cases cited. Similar principles would clearly render admissible anything in the subsequent conduct or appearance of a third party which tended to connect him with the crime.

[7] Nor was the after-discovered evidence of such "merely cumulative, corroborative or collateral character" as that it ought to have been excluded. It was specific and circumstantial upon a vital point, and if true (which was a question for the jury) it was such as that it would probably, if not necessarily, have produced a different result. In such cases the general rule of exclusion does not apply. *Johnson* v. *Commonwealth*, 126 Va. 770, 777, 101 S. E. 341; *Barsà* v. *Kator*, 121 Va. 290, 93 S. E. 613.

[8, 9] As to the confessions of Curtis Jenkins (as distinguished from his mere movements and conduct), it must be said that the authorities are almost unanimous in holding that evidence of confessions by third parties made out of court are not admissible as tending to exonerate the accused. The reason generally given for this holding is that such evidence would violate the rule against hearsay. In a note to *Brown* v. *State* (Miss.), 37 L. R. A. (N. S.), at page 347, the annotator says:

"This result is reached in many cases by invoking the hearsay rule; and this rule may safely be said to be essentially the basic principle of the decisions which do not expressly invoke it."

The authorities for this doctrine are so numerous and so highly respectable that we hesitatingly and with unaffected diffidence question their soundness; but we are not, after all, the first to make such a question, and we think it must be conceded that many of the courts and text-writers who stand for the doctrine have felt called upon to apologize for their position, or, if not to apologize, to undertake to explain to the lay mind that, although a contrary doctrine would appear to be demanded by common sense and natural justice, nevertheless a trained professional eye could see the matter in a different light. Upon a deliberate consideration, we have been unable to follow the current of authority on this question.

In this case of purely circumstantial evidence, if the accused had offered to prove that Curtis Jenkins, shortly before the homicide, had said: "I am going to kill officer Curtis," and that he was in the vicinity that night with a gun and cap like the one belonging to the accused, there could be no doubt that under the *Karnes Case, supra,* and under the generally prevailing doctrine as shown by Mr. Freeman's note, *supra,* as well as under the rule of reason, the evidence would be admissible. Then why not allow the accused to prove a subsequent admission, made under circumstances as directly connecting the declarant with the crime as those attending the threat above suggested? Both statements would, in a sense, be hearsay, but both, like any other guilty conduct of a third party, would tend to exonerate the accused, and ought to go to the jury for what they are worth. If there be doubt about

whether such declarations were actually made, or, if made, were true, such doubts, like any others as to the weight and credibility of testimony, ought to be settled by the jury. It may be true that evidence of extra judicial confessions is susceptible of abuse, but the same thing is equally true as to extra judicial admissions made against pecuniary or proprietary interests, and such admissions are now universally admitted, even when made by third parties to the litigation, if they are material to the issue. If a charge involving the life or liberty of a citizen, and depending solely upon circumstantial evidence, cannot stand the test of allowing the jury to determine from the testimony whether a third party has in fact confessed guilt, and if so whether such confession was true, a conviction ought not to follow.

We shall not undertake to review, or even cite the many authorities upon this question. The vast majority of them, as already conceded, are against our view. For full citation see 16 Cyc. 1199; 16 C. J., p. 643, sec. 1278, n. 50, 51 and 52; 2 Wig. Ev., sec. 1476, n. 9; 5 *Id.*, n. 9; 131 Am. St. Rep., note, p. 778; 37 L. R. A. (N. S.), note, p. 346; Ann. Cas. 1913 E, 722-3.

The case of *Donnelly* v. *United States*, 228 U. S. 243, 33 Sup. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913 E, 710, is a somewhat recent case and may be said to be directly in point, and adverse to the view which we believe to be the correct one. The majority opinion by Mr. Justice Pitney presents very ably the reasons and authorities for the prevailing rule. In that case Donnelly was convicted of murder. He offered at the trial to prove that one Joe Dick, since deceased, had confessed that he committed the murder, and that certain other circumstances pointed to Dick as the murderer. The court excluded the confession, and the Supreme Court

affirmed its action. The majority opinion expressly concedes the relevancy of the confession, but denies its admissibility. There was a dissenting opinion by Mr. Justice Holmes, concurred in by Mr. Justice Lurton and Mr. Justice Hughes, which we think was sound, and as it expresses our views well and briefly, we quote it in full:

"The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick. The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive law. There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder, it is far more calculated to convince than dying declarations, which would be let in to hang a man, *Mattox* v. *United States*, 146 U. S. 140; and when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. 2 Wigmore, Evidence, ss. 1476, 1477."

The reasons given by the authorities for rejecting proof of such evidence seem to us unsatisfactory and entirely arbitrary; and no rule of property being involved, we do not think it is even yet too late to abandon the unsound precedents and follow the rule of right and reason.    Certainly this is true in Virginia, for we are not hampered by any adverse decisions in this jurisdiction.

[10] Let us examine a little more closely the reasons for this rule of exclusion.    Confessions and admissions of third parties in criminal cases are excluded because their introduction in evidence is held to be a violation of the hearsay rule.    Hearsay evidence is excluded, to state the reasons briefly, because it lacks the sanction of an oath and the test of cross-examination, and facilitates the use of perjured testimony.    These are sound reasons and the rule is one of great importance, but one of the exceptions to this rule, universally recognized, is that relevant declarations against interest, where the declarant has since died or otherwise become unavailable as a witness, are receivable in evidence.    The basis of this exception to the rule is that the evidence itself is important to the ends of justice, and that the element of self interest affords a reasonably safe substitute for the oath and cross-examination as a guarantee of truth.    2 Wig. Ev., sec. 1421; *Id.* sec. 1455-6-7.

It seems that in England prior to 1844 this exception was not limited in such way as to exclude relevant admissions by third parties in criminal cases, but since the *Sussex Peerage Case* (1844), 11 Cl. & P. 109, it has been held with practical unanimity both in England and in this country that the exception does not include a statement of facts subjecting the declarant to criminal liability, but must be confined to declarations *against pe-*

*cuniary or proprietary* interest.    2 Wig. Ev., sec. 1476; 22 C. J. 235.

But why this distinction?    Is a man more likely to speak the truth to his own hurt about a pecuniary obligation or boundary line than about the more serious matter of his responsibility for crime?    If it is reasonable and safe to assume that the principle of self protection and self interest will sufficiently guarantee the truth in the former instances, it would seem equally reasonable and safe to assume that the same principle would answer a like purpose in the latter instance.

Nor can it be fairly said that public policy demands a limitation of the exception to declarations against money or property rights.    We are not concerned here merely with the fate of the accused in this case.    The principle with which we are dealing may be one of great importance to the public generally.    Surely the State is as much concerned in arriving at the truth in trials involving the honor and liberty and life of its citizens as in trials involving their property rights.    We can see no reason for making a difference between these two classes of cases, unless, indeed, there be some reason for making the difference in favor of the former.    In neither class can the exception apply when original testimony by the declarant is available; but when it is not, every reason which justifies the exception in the latter class justifies it in the former.    The relevancy is as clear, the necessity as great, and the guarantee of truth as potent.

If it be suggested that a third party making a confession out of court could not be compelled to testify because it would tend to incriminate him, the answer seems easy enough.    If he were dead or out of the jurisdiction, the question of privilege would not arise; if he were alive and present and claimed his privilege, he

would not be available as a witness, and the exception would apply with as much reason as if he were dead or absent.    And so, too (as seems to have probably happened in *Blocker* v. *State, infra*), if he were present and testifying, but denying that he made any such confession, then his own original testimony would not be available, and it would be competent and proper to introduce proof of the alleged confession by others who heard it, and let the jury determine as to the credibility of the testimony.

[11] Unfortunately, as all must concede, witnesses sometimes swear falsely, and it cannot be doubted that alleged confessions of crime by third parties may easily be foisted on the courts and juries, but so may alleged admissions in civil cases, as, for example, regarding the location of a corner tree or other real estate controversy.    As to both classes of admissions they must be admitted, if at all, because the evidence itself is important to the ends of justice, and because it may be assumed that no man will speak falsely to his own hurt. The truth of the admission itself, and the credibility of the witness who undertakes to repeat the admission, must, like the truthfulness of all other testimony, address itself to and be settled by the jury.

The views which we entertain are so well expressed by Professor Wigmore in section 1477 of the second volume of his book on Evidence that we set it forth here in full:

"It is plain enough that this limitation, besides being a fairly modern novelty, is inconsistent with the broad language originally employed in stating the reason and principle of the present exception (*ante*, ss. 1457, 1476) as well as with the settled principle upon which confessions are received (*ante*, s. 1475).    But, furthermore, it cannot be justified on grounds of policy.    No plausible reason of policy has ever been advanced for such a

limitation.   Furthermore, the practical consequences of
this unreasoning limitation are shocking to the sense of
justice; for, in its commonest application, it requires, in
a criminal trial, the rejection of a confession, however
well authenticated, of a person deceased or insane or
fled from the jurisdiction (and therefore quite unavail-
able) who has avowed himself to be the true culprit.
The absurdity and wrong of rejecting indiscriminately
all such evidence is patent.

"The rulings already in our books cannot be thought
to involve a settled and universal acceptance of this
limitation.   In the first place, in almost all of the rulings
the declarant was not shown to be deceased or other-
wise unavailable as a witness, and therefore the de-
claration would have been inadmissible in any view of
the present exception (*ante*, s. 1456).   Secondly, in some
of the rulings (for example, in North Carolina) the in-
dependent doctrine (*ante*, ss. 139-141) was applicable
that, in order to prove the accused's non-commission of
the offense by showing commission by another person,
not merely one casual piece of evidence suffices, but a
*prima facie* case resting on several concurring pieces of
evidence must be made out.   Finally, most of the early
rulings had in view, not the present exception to the
hearsay rule, but the doctrine of admissions (*ante*, ss.
1076, 1079) that the admissions of one who is not a co-
conspirator cannot affect others jointly charged.   It is
therefore not too late to retrace our steps, and to dis-
card this barbarous doctrine, which would refuse to let
an innocent accused vindicate himself even by produc-
ing to the tribunal a perfectly authenticated written
confession, made on the very gallows, by the true cul-
prit now beyond the reach of justice. Those who watched
with self-righteous indignation the course of pro-
ceeding in Captain Dreyfus' trial should remember

that, if that trial had occurred in our own courts, the spectacle would have been no less shameful if we, following our own supposed precedents, had refused to admit what the French court never for a moment hesitated to admit—the authenticated confession of the escaped Major Esterhazy, avowing himself the guilty author of the treason there charged."

It is to be noted that although the great majority of decisions are apparently in conflict with our view, very few of them involve the unusual combination of circumstances appearing in this case. In most of the decided cases the declarant was not shown to be unavailable as a witness; and in many of them there was nothing but the bare confession of the declarant to connect him with the crime. (2 Wig. on Ev., sec. 1477, *supra.*) For the reasons already indicated, a statement of which seemed to us important to an adequate discussion of the question, we are disposed to think that the evidence of even a bare confession by a deceased or unavailable witness ought to go to the jury for what they may consider it worth; but as our decision here must be regarded as out of line with the current of authority, we will expressly limit its effect as a precedent in this court to the particular facts of the case in hand.

In at least one case we find a precedent for this decision, and the "new rule" applied therein seems to have the approval of Mr. Freeman in his very elaborate note thereto. We refer to the case of *Blocker* v. *State*, 55 Tex. Cr. R. 30, 114 S. W. 814, 131 Am. St. Rep. 772. In that case the opinion does not clearly show whether the declarant, one Aaron Massey, was available as a witness. The inference, we think, is that he testified against the accused and denied his own guilt, but the case is in point here because the evidence showed motive and opportunity on Massey's part, and the judg-

ment of conviction was reversed because the trial court refused to allow the accused to go further and prove that Massey had said two nights after the homicide that he had killed the deceased.

Mr. Freeman in his note to the case last cited, 131 Am. St. Rep. at page 786, says: "We have not been able to discover any other cases in which such declarations have been admitted in evidence under similar circumstances. The evidence is without doubt mere hearsay and its admissibility must be justified as being necessary under the exceptional circumstances existing in the case before the court. This new rule, if restricted to cases in which the incriminating evidence is wholly circumstantial and equally strong against the defendant and the third person making the declarations of guilt, would seem to be sound, since the person making the confession would be in as great danger of conviction for the crime as the person on trial." While we do not entirely concur with Mr. Freeman in his reasons, we are glad to be able to quote him as apparently approving the decision. We think the evidence he was talking about should constitute an exception to the hearsay rule, and that it ought to be admitted not only in cases where the incriminating evidence is equally strong against the defendant and the declarant, but in all cases where there is anything substantial other than the bare confession to connect the declarant with the crime.

In the note to *Brown* v. *State, supra,* 37 L. R. A. (N. S.) at page 346, the annotator says: "That a person on trial for the commission of a crime may in exculpation of himself introduce direct evidence of acts and conduct of another or of other concrete facts or circumstances tending to fix the crime upon such other," supporting this statement by the citation of a number of cases, and then adds a very complete array of de-

cisions, "whose unanimity," says the annotator, "is as complete as the shock which they give the general sense of justice, that evidence of the confession or admission of a stranger that he is the perpetrator of the offense is not admissible."

In a note to *Donnelly* v. *United States, supra,* Ann. Cas. 1913 E, 710, the majority rule is referred to as one which "shocks the sense of justice of the ordinary person;" and this further comment is there made: "The ground on which this vicious rule has been based is of course the hearsay rule. The exception to the hearsay rule made in the case of declarations against interest has been confined to declarations against the pecuniary interests of the declarant. The absurdity of such a limitation on the exception would seem to be apparent, for on what grounds can it be said that a man might truly make a statement detrimental to his interest in realty of small value, and yet not as truly make a statement which might involve penal servitude for life, or even capital punishment."

In the case of *Karnes* v. *Commonwealth, supra,* we intended to take a forward step in our ruling upon the admissibility of evidence tending to show the guilt of a third party in exoneration of the accused. In doing so we thought we were promoting the ends of justice, and we were certainly in accord with the trend of modern legislative and judicial policy in this respect. We quote below from the opinion in that case as follows:

[12] "Much must be left to the discretion of the trial judge, but where the determination of a fact depends upon circumstantial evidence, the safe, practical rule to follow is that in no case is evidence to be excluded of facts or circumstances connected with the principal transaction from which an inference can reasonably be drawn as to the truth of the disputed fact.  *  *  *

Instead of withholding any vailable information by the application of rigid rules of exclusion 'the more excellent way' is to admit all testimony which will enlighten the triers of fact in their quest for the truth. The better view is, not how little but how much logically competent evidence is admissible."

So far as the confessions of Curtis Jenkins are concerned, the learned and upright judge who tried this case followed the almost unbroken current of authority. For reasons which we have stated, however, we feel constrained to hold that the affidavits made out a proper case for a new trial on the ground of after-discovered evidence. Even without the confessions, which we think were clearly admissible under the circumstances, the other facts shown in the affidavits as to the motive and conduct of Jenkins, his absence from home that night, his appearance the next morning, his size and weight as compared with that of the unkown man who was seen to flee from the vacant lot, the ownership of a pistol like the one owned by Hines and his ownership and loss that night of a cap like the one found at the scene, are such material circumstances as that the accused ought not to have been deprived of the benefit of them before the jury. By practically all the authorities these latter facts and circumstances were admissible.

[13] If this were a case in which we could say that the evidence as actually introduced was conclusive of the guilt of the accused, then we could ignore the after-discovered evidence. The jury found upon the original evidence that he was guilty beyond a reasonable doubt, and as they were the sole judges of the weight and credibility of the testimony, their verdict thereon could not be disturbed. But the vital facts upon which that verdict was based were disputed, and this new

evidence, if they had heard and believed it, would necessarily have produced a different result.    We do not undertake to say what weight a jury would give to the new evidence, but it certainly ought to change the result if it is worthy of belief, and whether it is worthy of belief is a question which ought to be settled, not by the court, but by a jury.

[14] It has been necessary to discuss the evidence in this case, both the old and the new, but there has been no intention to express an opinion as to the actual guilt or innocence of the prisoner, or as to the weight or credibility of the testimony; and nothing said herein is to be so construed by the trial court or used with any such construction before the jury on another trial.

The judgment will be reversed, the verdict of the jury set aside, and the case remanded for a new trial to be had not in conflict with the views herein expressed.

*Reversed.*