COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Fulton and Lorish
Argued at Norfolk, Virginia

DEMETRIUS LAMAR BAZEMORE

v.      Record No. 0031-24-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
NOVEMBER 12, 2024

FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Matthew A. Glassman, Judge[1]

Lauren E. Brice, Assistant Public Defender (Virginia Indigent
Defense Commission, on briefs), for appellant.

Linda R. Scott, Senior Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of the City of Suffolk convicted Demetrius

Lamar Bazemore of possession of a firearm by a convicted violent felon, in violation of Code

§ 18.2-308.2.  On appeal, Bazemore argues that the trial court erred in denying his motion to

suppress the evidence.  He also argues that the trial court erred in excluding a hearsay statement

made by the passenger in his vehicle during the traffic stop.

I.  BACKGROUND

"Under familiar principles of appellate review, we will state 'the evidence in the light most

favorable to the Commonwealth, [as] the prevailing party in the trial court, and will accord the

Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence.'"

---

[1] The Honorable Matthew A. Glassman presided at the jury trial and at the sentencing
hearing, and the Honorable W. Richard Savage, III, sitting as a judge designate, presided at the
suppression hearing.

*Sidney v. Commonwealth*, 280 Va. 517, 520 (2010) (quoting *Murphy v. Commonwealth*, 264 Va. 568, 570 (2002)).

Suffolk Police Officer Clay S. Strobel testified at the suppression hearing and at trial that, around 2:00 a.m. on June 9, 2022, he was on patrol when he saw a red Chevrolet pass him with "no front license plate." He noted that "usually most vehicles from my experience that don't have front plates have expired registration and they don't have a correct registration. That those more than likely can, those can relate to stolen vehicles." Officer Strobel then turned his patrol car around and began following the vehicle. He recounted that "when I was following behind the vehicle I saw both occupants of the vehicle make multiple furtive movements." He further recounted that "the driver, he reached down like next to his seat towards the center console. And the passenger, he looked behind him multiple times. And you could also see him when he was looking behind him you could see like his left shoulder dip down and you could see him reach behind towards the back of the driver's seat." Officer Strobel testified the movements of the driver and the passenger concerned him because "[u]sually with those movements from my training and experience, those usually are contributable with, like those movements are not normally made by occupants of a vehicle. And when they are they usually are concealing firearms or contraband."

Officer Strobel then pulled over the vehicle "outside of the Sector 1 police station," where there were "multiple street lights" that "illuminated the vehicle." He could see the driver and the passenger "looking behind them waiting to see like where I was approaching them from." Officer Strobel approached the vehicle on the passenger side. He shined his flashlight into the vehicle, and he "could see the seat behind the driver seat was pulled down, but the other seat was up." He noted that the folded-down seat "raised more of a suspicion of the furtive movements made toward that direction." Officer Strobel recalled that, when he approached the

vehicle, the passenger was "blading his body a little bit and he was breathing very rapidly." The passenger's body movement impeded Officer's Strobel's ability to see the vehicle's center console.

Officer Strobel "advised the driver of the reason for the stop, which was the expired registration." He then stated, "I asked for their identification and I advised them the reason for the stop. The driver provided his ID card because he wasn't licensed. And then the passenger provided his driver's license which was out of New York." Demetrius Bazemore was the driver of the vehicle while his cousin, Tyriece Bazemore, was in the front seat and the vehicle's sole passenger. Officer Strobel also "asked for the registration of the vehicle, and they didn't have registration. They provided the title to the vehicle." However, "[t]he title wasn't signed" and "it wasn't notarized either. The driver advised that he had just bought the vehicle."

Once Suffolk Police Officer Cody L. Cobb arrived to assist with the traffic stop, Officer Strobel "asked the driver to step out of the vehicle to talk," and he testified that he did so "[j]ust for the movements made." Officer Strobel also noticed that the driver's eyes were bloodshot. When asked, the driver "advised that he had smoked marijuana about an hour ago." Officer Strobel then checked the driver's and the passenger's identifying information using a police database. He learned that the driver "has a gang affiliation, drug user. And he had previous charges with firearms." The driver also "had a charge on there for robbery." Officer Strobel noted that, based on his training and experience, gang-affiliated individuals "usually are known to carry firearms." Furthermore, given the driver's criminal history, it was "more likely to be a firearm in the vehicle."

Officer Strobel next spoke to the passenger, who told the officer about from where he and the driver were coming, which was inconsistent with what the driver had just told the officer. Officer Strobel then had the driver and the passenger stand next to each other outside the vehicle

and "asked them is there anything illegal in the vehicle." He also "advised them of like the furtive movements" he had observed earlier. Although the driver and passenger had "maintained eye contact" with Officer Strobel during their earlier interactions, "they looked away" when he asked them about the contents of the vehicle. Officer Strobel then told the driver and the passenger that he "was going to frisk the vehicle," and the driver responded that there "ain't nothing in there." Given the furtive movements and the nervousness of the driver and the passenger, the driver's involvement with gangs, and the driver's criminal history, including charges involving firearms and robbery, Officer Strobel determined that he had "a reasonable belief that there would be a weapon in the vehicle." He emphasized that his "concern was for my safety and my other officer's safety."

After searching the driver side compartment of the vehicle, Officer Strobel noticed that "in the center console there was a big bag of green, leafy substance," which he believed to be marijuana. He recalled that "there was two bags. One bag was located on the center console, and one bag was like wedged down behind, in between the two seats."[2] He left the bags of marijuana in the vehicle and returned to where the driver and the passenger were standing near the vehicle. Without specifying what he had just found in the vehicle, Officer Strobel "asked them whose it was." Neither the driver nor the passenger responded to Officer Strobel's question. Officer Strobel then told them that they "both would be detained until someone, like, told me whose it was." As Officer Cobb began placing the passenger in handcuffs, the driver "said it's his and it's clean anyways." Officer Strobel testified that he understood the driver to be

---

[2] The parties stipulated at trial that the total weight of the recovered marijuana was eight-and-a-half ounces. In Virginia, "a person 21 years of age or older may lawfully possess on his person or in any public place not more than one ounce of marijuana." Code § 4.1-1100(A). However, "any person who possesses on his person or in any public place . . . more than four ounces but not more than one pound of marijuana . . . is guilty of a Class 3 misdemeanor." Code § 4.1-1100(C).

"referring to, like, a firearm," not to the marijuana. Based on his experience in law enforcement, Officer Strobel understood the term "clean" in the context of firearms to mean that "it's not stolen" and that "it's legally purchased and legally owned."

After the officers placed the driver and the passenger in handcuffs, Officer Strobel "searched the rest of the vehicle." He recalled that "the marijuana was there, underneath there was a scale. And then in the rear of the vehicle behind, like, the driver's seat where the one seat was laid down, underneath, like, clothing there was a[n] assault rifle" with a loaded magazine. He clarified that there were two jackets covering the firearm. Next to the firearm, he found a wallet inside a black Adidas bag containing what appeared to be counterfeit one-hundred-dollar bills. In the front pocket of the Adidas bag, there was a white envelope bearing the driver's name. Officer Strobel asked the driver "whose bag it was," and the driver said it was probably his own bag. Officer Strobel then arrested the passenger for possession of a concealed weapon but he did not arrest the driver until later – after confirming that the driver was a convicted felon.

Before trial, counsel for Demetrius Bazemore filed a motion to suppress the evidence obtained from Officer Strobel's search of the vehicle. Acknowledging that "[t]he stop was totally legit," Bazemore's trial counsel argued that "there was no indicia that they [the driver and the passenger] were armed. Really no reason for the search." He contended that Officer Strobel merely "had a hunch that they might be armed and he acted on it." He clarified, however, that "once the marijuana is discovered it's fair game from there. I'll concede that. So it's the initial search that we're contesting." After hearing argument, the trial court denied Demetrius Bazemore's motion to suppress, stating, "I find that he [Officer Strobel] did have a reasonable articulable suspicion that would justify the search."

Two days before the jury trial, Demetrius Bazemore's defense counsel filed a discovery response pursuant to Rule 3A:11(d)(5)[3] stating that he may call Tyriece Bazemore as a witness. However, on the first day of the trial, defense counsel informed the trial court that he did not "anticipate calling any witnesses" and that he was ready to proceed with the trial. During cross-examination of Officer Strobel, defense counsel attempted to introduce a hearsay statement from Tyriece Bazemore in which Tyriece said he owned both the firearm and the marijuana that were found inside the vehicle. Officer Strobel had recorded the statement in a criminal complaint. Defense counsel proffered to the trial court that, in the criminal complaint, Officer Strobel had written, "I then placed Mr. [Tyriece] Bazemore in custody. As he [Tyriece Bazemore] stated, the green, leafy substance and the firearm was his."

The attorney for the Commonwealth objected to the admission of the statement, arguing that the statement was inadmissible hearsay because the trial court had not declared Tyriece Bazemore an unavailable witness and because the defense had not "exercised due diligence" in attempting to procure Tyriece Bazemore's appearance at trial. Defense counsel countered that the hearsay statement was admissible under Virginia Rule of Evidence 2:804(b)(3)[4] as a statement against interest. However, defense counsel conceded that Tyriece Bazemore is "under subpoena. He's on the witness list. I had contact with him and he, basically, blew me off and that's where we're at. Had he been here, would I put him on the stand? I don't know because he's still somewhat a dangerous witness. But he didn't respond to a subpoena." The trial court

---

[3] Rule 3A:11(d)(5) requires the accused to "[p]rovide to the Commonwealth a list of the names and, if known, the addresses of all persons who are expected to testify on behalf of the accused at trial or sentencing."

[4] Virginia Rule of Evidence 2:804(b)(3) defines a "[s]tatement against interest" as either "[a] statement which the declarant knew at the time of its making to be contrary to the declarant's pecuniary or proprietary interest, or to tend to subject the declarant to civil liability," or as "[a] statement which the declarant knew at the time of its making would tend to subject the declarant to criminal liability, if the statement is shown to be reliable."

asked defense counsel the manner in which Tyriece Bazemore had been served with the subpoena, and defense counsel replied, "Posted but to a relative who told us that she would pass it. I've had phone conversations, as has my investigator, with this witness, but he wouldn't tell us physically where he was. That's where we're at, Judge." The trial court then asked defense counsel, "And if you — he was going to be a material witness, why didn't you ask for court intervention or a continuance or something of that nature?" Defense counsel responded that "every witness has their ups and downs, and that was a tactical decision to go forward without him because you put a witness up there, he can get crushed on cross-examination. I know that. You know that. The Commonwealth knows that." After hearing argument, the trial court sustained the Commonwealth's objection.

The jury found Demetrius Bazemore guilty of possession of a firearm by a convicted violent felon. By final sentencing order entered on December 8, 2023, the trial court convicted him of the offense. Bazemore appeals to this Court.

## II. ANALYSIS

### A. The Motion to Suppress

On appeal, Demetrius Bazemore argues, "The trial court erred by denying Mr. Bazemore's motion to suppress where the law enforcement officer did not have the requisite reasonable articulable suspicion to justify a 'frisk' of the vehicle."

The Supreme Court has often stated, "The defendant has the burden to show that, when viewing the evidence in the light most favorable to the Commonwealth, the trial court's denial of the motion to suppress was reversible error." *Sidney*, 280 Va. at 522. "We review de novo the trial court's application of the law to the particular facts of the case." *Branham v. Commonwealth*, 283 Va. 273, 279 (2012). However, we are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due

weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (*en banc*) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We "presume — even in the absence of specific factual findings — that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019).

"When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *Commonwealth v. White*, 293 Va. 411, 414 (2017). "In contrast, as an appellate basis for reversing a criminal conviction based on an erroneous pretrial ruling, evidence at trial becomes relevant only if the defendant renews his pretrial motion at trial." *Id.* at 414 n.2.

> Only in doing so does an appellant satisfy Rule 5:25 by inviting the trial court to reconsider its pretrial ruling in light of the actual evidence presented — rather than merely relying solely upon the charging documents, pretrial proffers of the parties, or cursory evidentiary presentations as the trial court sometimes must do when deciding the issue prior to trial.

*Id.* In this case, Demetrius Bazemore did not renew his motion to suppress at trial.

After a police officer initiates a traffic stop, "the Fourth Amendment permits police to conduct a pat down of a person and a protective sweep of his or her vehicle for weapons under certain circumstances." *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021). "A vehicle sweep justified by officer safety concerns is permissible if it occurs *during an investigatory detention that falls short of an arrest*." *Id.* at 14 (emphasis in original). The vehicle sweep "is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The "police may conduct a protective sweep of the vehicle based on the assumption that when the stop concludes, the individual presumably 'will be permitted to reenter his automobile' and 'will then have access to any weapons inside.'" *Bagley*, 73 Va. App. at 15 (quoting *Long*, 463 U.S. at 1052). "Such a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *Gross v. Commonwealth*, 79 Va. App. 530, 537 (2024) (quoting *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007)).

"To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or 'hunch' that criminal activity is afoot." *McCain v. Commonwealth*, 275 Va. 546, 552 (2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). Indeed, the officer must "supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." *Id.*

> The requisite level of *belief*, when calibrated to reasonable suspicion, is less than probable cause, less than a preponderance, and certainly less than beyond a reasonable doubt. All that is required is a *suspicion* — a reasonable one that is not "the product of a volatile or inventive imagination" or one "undertaken simply as an act of harassment."

*Hill*, 297 Va. at 817 (emphases in original) (quoting *Terry*, 392 U.S. at 28). In short, "[t]he standard requires proof of only a reasonable belief that the suspect *might* have a weapon and gain control of it." *Bagley*, 73 Va. App. at 16 (emphasis in original).

To determine whether Officer Strobel had reasonable, articulable suspicion to conduct a protective sweep of Bazemore's vehicle, "we must consider 'the totality of the circumstances — the whole picture.'" *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "Circumstances relevant in this analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the

suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *McCain*, 275 Va. at 554. The Supreme Court of the United States has emphasized that this analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418). The inquiry is not whether an individual factor, viewed alone, "is susceptible to innocent explanation," but whether the various factors, "[t]aken together," are sufficient "to form a particularized and objective basis" for an officer's suspicion. *Arvizu*, 534 U.S. at 277-78.

In *Hill v. Commonwealth*, 297 Va. 804, 816 (2019), two narcotics detectives saw the defendant alone in his parked car making up-and-down glances and curious movements within the vehicle. As soon as the defendant saw the detectives begin walking toward his vehicle, he "turned away from them and started digging frantically between the driver's and passenger's seats." *Id.* The Supreme Court affirmed the trial court's determination that the two narcotics detectives had reasonable suspicion to believe that the defendant may have been reaching for a weapon. *Id.* at 817. Likewise, in *Gross*, 79 Va. App. at 539, officers pulled over the defendant after he sped through a stop sign. When the defendant, who had already pulled over, realized that the officers were approaching his vehicle on foot, he made a series of movements within the vehicle that gave the officers reason to believe that he could well be searching for and reaching for a weapon. *Id.* Based on the totality of the circumstances, we found that the officers had reasonable, articulable suspicion to believe that the defendant was armed and dangerous during the traffic stop. *Id.* at 539-40. Thus, we held that the officers could do a protective sweep of the defendant's vehicle for officer safety. *Id.* at 540.

In this case, Officer Strobel testified that, in the early morning hours, he saw a vehicle pass him without a front license plate. He began following the vehicle because "usually most vehicles from my experience that don't have front plates have expired registration and they don't have a correct registration." As he followed the vehicle, Officer Strobel saw both the driver and the passenger "make multiple furtive movements." He noted that the driver "reached down like next to his seat towards the center console," while the passenger "looked behind him multiple times" and "reach[ed] behind towards the back of the driver's seat." Strobel also testified that he "followed behind the vehicle until it was a more reasonable amount of time to safely stop the vehicle" so he did not try to immediately tell Demetrius Bazemore to pull his vehicle over while the furtive movements in it were already occurring. After soon stopping the vehicle, when Officer Strobel approached the passenger side of the vehicle, he noticed that one of the back seats was folded down, which "raised more of a suspicion of the furtive movements made toward that direction." In addition, Officer Strobel testified that, when he interacted with the passenger and the driver, he noticed that "you could tell they're very nervous. The passenger's breathing was, like, very heavy, like, very fast." Strobel further testified that the passenger had turned his body to block the officer's view of the vehicle's center console.

Furthermore, Officer Strobel stated that he "asked for the registration of the vehicle, and they didn't have registration." He noted that "[t]he driver provided his ID card because he wasn't licensed." Using the driver's identifying information, Officer Strobel learned that the driver had a gang affiliation and that he had prior charges involving firearms – as well as a robbery charge. Officer Strobel testified that, based on his training and experience, gang-affiliated individuals "usually are known to carry firearms." Officer Strobel further testified that, given the driver's criminal history, there was "more likely to be a firearm in the vehicle." In addition, the driver and the passenger gave Officer Strobel conflicting answers about where they

were coming from before the traffic stop.  In short, based on the totality of the circumstances before us in this case, with each individual fact mounting upon the others, Officer Strobel certainly had reasonable, articulable suspicion that Demetrius Bazemore was armed and dangerous during the traffic stop.  Therefore, Officer Strobel could do a protective sweep of the vehicle for officer safety.  Consequently, we hold that the trial court did not err in denying Demetrius Bazemore's motion to suppress.

### B.  The Hearsay Statement

Bazemore also argues that "The trial court erred by excluding the passenger's statements that 'the green leafy substance and the firearm was his.'"

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion."  *Wolfe v. Commonwealth*, 67 Va. App. 97, 106 (2016) (quoting *Blain v. Commonwealth*, 7 Va. App. 10, 16 (1988)).  "On appellate review of issues involving the admissibility of evidence, the Court views the evidence in the light most favorable to the Commonwealth as the party who prevailed below."  *Haas v. Commonwealth*, 71 Va. App. 1, 5 n.1 (2019), *aff'd in part and vacated in part*, 299 Va. 465 (2021).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Va. R. Evid. 2:801(c).  "Hearsay evidence is inadmissible at trial unless it falls into one of the recognized exceptions to the rule."  *Clay v. Commonwealth*, 33 Va. App. 96, 104 (2000) (*en banc*), *aff'd*, 262 Va. 253 (2001).  "A person seeking to have hearsay declarations admitted must clearly show that they are within an exception to the rule."  *Id.*

Under the hearsay exception found in Virginia Rule of Evidence 2:804(b)(3), a statement made by a declarant who is unavailable may be admissible if the declarant knew that the

statement tended to subject him to criminal liability and if the statement is shown to be reliable.[5]

"Unavailability is a threshold question, to be resolved before a court considers the content of the statement to determine whether it was against the declarant's penal interest and was sufficiently corroborated to be considered reliable." *Bailey v. Commonwealth*, 62 Va. App. 499, 507 (2013).

> In order to fall under the "declaration against interest" exception to the hearsay rule, the party offering the statement must prove that the declarant is unavailable, that the statement was against the declarant's interest at the time it was made, and that the declarant was aware, at the time the statement was made, that it was against his interest.

*McDonnough v. Commonwealth*, 25 Va. App. 120, 127 (1997). "In Virginia, a declarant is unavailable if the party seeking to introduce the statement has been unable by diligent inquiry to locate the declarant." *Id.* "Due diligence requires only a good faith, reasonable effort; it does not require that every possibility, no matter how remote, be exhausted." *Id.* at 129. "Determining whether the offering party has met its burden and, thus, whether the declarant is 'unavailable,' is left to the trial court's discretion." *Id.* at 127 (quoting *Jones v. Commonwealth*, 22 Va. App. 46, 50 (1996)). "Whether a party has used due diligence is a factual question that will be reversed on appeal only if it is plainly wrong or without evidence to support it." *Id.*

Here, although Demetrius Bazemore's trial counsel identified Tyriece Bazemore as a potential witness and provided a Suffolk address for him, defense counsel admitted to the trial court that he made a tactical decision to allow the jury trial to proceed without actually being able to call Tyriece Bazemore as a witness. At the beginning of the jury trial, defense counsel announced that he was prepared to proceed. He neither advised the trial court that a subpoenaed material witness was not present nor did he request a continuance. During *voir dire*, he stated he

---

[5] For purposes of the "declaration against interest" exception to the hearsay rule, a "reliable" statement is "one where 'there is anything substantial other than the bare confession to connect the declarant with the crime.'" *Ellison v. Commonwealth*, 219 Va. 404, 408-09 (1978) (quoting *Hines v. Commonwealth*, 136 Va. 728, 748 (1923)).

- 13 -

did not "anticipate calling any witnesses." He later attempted to introduce Tyriece Bazemore's hearsay statement during cross-examination of Officer Strobel, but he admitted that even if Tyriece Bazemore had appeared at trial, he may not have called Tyriece Bazemore to testify because "he's still somewhat a dangerous witness." Defense counsel candidly admitted that it "was a tactical decision to go forward without him because you put a witness up there, he can get crushed on cross-examination." He also made no effort to have the trial court enforce the subpoena of Tyriece Bazemore. Consequently, the record before this Court on appeal shows that, rather than demonstrating due diligence, defense counsel sought to take advantage of Tyriece Bazemore's absence for mere tactical purposes. In short, given the foregoing and Demetrius Bazemore's lack of providing any corroboration that he had even obtained posted service after subpoenaing Tyriece Bazemore, Demetrius Bazemore had not shown that the trial court was plainly wrong in finding that Demetrius had failed to satisfy the due diligence requirement — or that Tyriece Bazemore was actually unavailable as a witness. Therefore, we certainly cannot say the trial court abused its discretion in refusing to admit Tyriece Bazemore's hearsay statement at trial.

## III. CONCLUSION

For all of the foregoing reasons, we affirm the trial court's judgment, and we uphold Demetrius Bazemore's conviction.

*Affirmed.*