TROY D. HOPKINS

v.

COMMONWEALTH OF VIRGINIA

No. 0110-93-2

Decided September 6, 1994

Counsel

Arnold R. Henderson (Wilder & Gregory, on brief), for appellant.

Richard B. Smith, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

Opinion

**BENTON, J.**—Troy D. Hopkins appeals from his convictions for first degree murder, attempted robbery, use of a firearm in the commission of murder, and use of a firearm in the commission of attempted robbery. He challenges the trial judge's refusal to grant a new trial based on after-discovered evidence and to exclude from evidence a witness's identification that Hopkins contends was unduly suggestive. We reverse the convictions and remand for a new trial.

I.

The evidence at trial proved that at 4:00 a.m. on July 21, 1990, Janice Talley drove Curtis Kearney in her automobile to Afton Avenue, a place where drugs are sold, which she described as "a terrible place to go." She and Kearney had been drinking a lot of beer; she had consumed five or six beers. She testified that after Kearney got out of the automobile she followed him to see what he was going to do. When she was about six feet behind Kearney, she saw a person with a red mask on his face approach Kearney with a gun and demand money. She testified that the person shot and killed Kearney with a gun she recognized to be a ".32." She testified that the mask fell off the assailant's face, and she heard the assailant say, "Curtis — I just shot Curtis." She testified that the assailant then asked her if she knew Kearney. She said no and ran to her automobile.

She further testified that when the police arrived, she told an officer, "I heard — I heard the name, Squeeky, before . . . the thing came off his face. I heard, 'Squeeky, why did you shoot that man?'" She testified that she had not seen the assailant before that night. When asked if she looked at him, she responded:

Well, I was shocked, you know, at what was happening, what went down. Yes, I looked at him. . . . I was scared. I looked,

you know, to see who did it, you know.

She testified that she told the police that the assailant was "about 5′5″ or 5′6″, . . . weighed about 130 pounds, . . . had short hair, and . . . he happened to have gold teeth in his mouth, up in his right side." She also testified that the person who shot Kearney was wearing blue jeans and a blue striped shirt.

A month after the incident, she was shown an array of six photographs and selected a photograph of Hopkins. One month after she selected his photograph, she was shown another array of six photographs. Again she picked a photograph of Hopkins. His photograph was the fourth photograph in both arrays. In court, she pointed to Hopkins when she was asked if the assailant was in the courtroom.

Officer Bohannon testified that when he arrived at Afton Avenue, he spoke to Talley. She told him that a person named "Squeeky" shot Kearney. Detective Quick interviewed Talley later that morning. He testified that she described the assailant as follows:

Black, male, dark skinned, young looking, 15 to 16, 5′6″, 130 pounds, possibly a gold tooth on the upper side. . . . He had a red scarf over the lower part of his face, which he removed at one point, and then a white shirt with blue stripes, and blue jeans.

The detective also testified that Talley said "someone there call[ed] him by the name, which was Squeeky." He also testified that Talley picked Hopkins's photograph from two photograph arrays.

In Hopkins's defense, James Branch, a long time friend of Hopkins who lived on Afton Avenue, testified that thirty people were out on the street that morning. He said that Kearney asked him for drugs moments before being shot. After Kearney walked away from him, three boys approached Kearney. One of the three boys, a fifteen year old who was five feet, two inches tall, light skinned, and known as "Scooby," actually shot Kearney. He denied seeing Talley present at the time of the shooting. He also testified that Hopkins was not present and did not shoot Kearney. He stated that he did not tell anyone that "Scooby" shot Kearney

until he learned that Hopkins had been wrongly accused.

Hopkins did not testify. The jury convicted Hopkins of all charges.

## II.

After trial, Hopkins made a motion for a new trial based on after-discovered evidence. Affidavits attached to the motion from relatives of Adrian Epps asserted that Epps was known as "Scooby" and was the murderer. Following an evidentiary hearing, the trial judge denied the motion. The transcript of the evidentiary hearing was not timely filed. *See* Rule 5A:8. The trial judge found that Hopkins had failed to show that the evidence was not discoverable before trial and that the after-discovered evidence was insufficiently credible to be likely to produce an opposite result on the merits upon retrial.

Alleging as error the trial judge's refusal to suppress Talley's identification and award a new trial, Hopkins petitioned this Court for an appeal. This Court granted Hopkins's petition for appeal only on the issue of the unduly suggestive identification. After briefs were filed, Hopkins moved this Court to remand the case to the circuit court because of additional after-discovered evidence. The Commonwealth's Attorney for the City of Richmond, whose office prosecuted the case at trial, joined in the motion. The Attorney General also agreed to a remand for the purpose of allowing Hopkins to pursue a motion for a new trial. This Court remanded the case to the trial court pursuant to Rule 5A:36.

Hopkins's second motion for a new trial contained several affidavits, including Epps's affidavit that he shot Kearney and Kearney's niece's affidavit that she saw Epps shoot Kearney. At the evidentiary hearing, William Wilson testified that he was on Afton Avenue the night Kearney was shot and that he was thirty-five to forty feet from the shooting site. He testified that he did not know Hopkins. He testified that although he did not see the gun, he saw the shooting. He also said that he could not see the person who fired the gun. However, he testified that he did not see Hopkins on Afton Avenue that morning and would have seen him if he had been there. He also testified that when he saw the shooting he called the police telephone emergency number. He said he did not come forward with information that Hopkins was not on

Afton Avenue that morning until he read in the newspaper that Hopkins had been convicted. He then contacted Hopkins's lawyer.

Marvin Robinson, who was twenty-three years old, testified that at the time of the murder, he resided with his mother and his brothers, Melvin Hawkins and Roy Hunt. His cousins George Epps and Adrian "Scooby" Epps were "staying" there in July 1990. He testified that at approximately 5:00 a.m. on the morning of the murder, his brother Melvin and cousins Adrian and George awakened him and spoke to him. He then ran to his mother and told her of the conversation. After he later read in the newspaper that Hopkins had been convicted of Kearney's murder, he contacted Hopkins, Adrian Epps's mother, and Hopkins's lawyer and told them that he knew Hopkins was innocent of the murder. Robinson testified that he came forward when he did because he learned that the wrong man had been convicted.

Melvin Hawkins, who was nineteen years old, testified that he was "getting drunk" with his cousin Adrian Epps on Afton Avenue on the night of the murder. He stated that Kearney approached him and asked him for "works," i.e., needles for the intravenous ingestion of drugs. Hawkins testified that Kearney wanted the "works" so that he could use the cocaine that Hawkins had sold him approximately three and one-half hours earlier. Hawkins told Kearney that he did not have any needles he could give him. Hawkins testified that Kearney then became agitated. As Kearney was about to hit Hawkins, Adrian Epps then emerged from behind a building and shot Kearney. Epps was wearing burgundy pants, black Reebok sneakers, a Los Angeles Raiders hat and had a towel wrapped around his face.

Hawkins further testified that he had given the gun to Epps earlier that day and that he was four or five feet from Epps when Epps fired the gun. Hawkins testified that he ducked when he heard the shot because the shot surprised him. He then asked Epps why he shot the man. Hawkins said that Epps threw the gun to him and fled. Hawkins testified that he then threw the gun on a nearby rooftop and stayed at the scene. Approximately one-half hour later, Epps returned and was wearing different clothes. Hawkins testified that he did not see Hopkins on Afton Avenue the night Kearney was shot. Hawkins also testified inconsistently from his earlier testimony that he had bought cocaine from Kearney earlier that night.

On cross-examination, Hawkins described Kearney as wearing a grey work uniform with a name tag and wearing a grey hat. When shown a picture of Kearney's body as it was found at the scene of the crime, Hawkins agreed that Kearney was wearing blue pants and a white shirt and that there was a black hat near Kearney's body. Hawkins testified, however, that the photograph depicted the person from whom he had purchased drugs and who was shot by Epps.

Charmane Kearney, who was age eighteen, testified that Curtis Kearney was her uncle. She testified that she too was on Afton Avenue the night of the murder and that she witnessed the shooting. She testified that she saw Hawkins and Adrian Epps standing together and talking with Kearney. She stated that Epps threatened to kill her uncle, that her uncle denied having any money, and that Epps then shot her uncle. She testified that she heard Hawkins say, "Scooby, man, why [did] you shoot that man." She further testified that her grandmother told her not to reveal what she knew about the murder unless the wrong man was convicted. She testified that Hopkins did not shoot her uncle and that when she learned that Hopkins had been convicted she told the Commonwealth's Attorney what she knew about the murder. She testified that she had known Epps since the fifth grade.

Adrian Epps testified that he was sixteen, that he was known as "Scooby," and that he was on Afton Avenue on the night of the murder. He resided in Maryland but was "staying" with his cousin in July 1990. He admitted that he shot Kearney. He testified that Hawkins began talking with Kearney and that he approached the pair and asked for a cigarette. He then began arguing with Kearney and when it appeared that Kearney was reaching for a gun, Epps shot him. Epps also admitted fleeing after the shooting,. changing his clothes, and then returning to the scene. He testified that after the shooting he threw the gun away in a creek. Epps also admitted that at an earlier hearing he denied shooting Kearney. He said that he lied then because he was scared.

On cross-examination, Epps testified that he was fourteen years old at the time of the murder and that someone had told him that if he were prosecuted for murder he would only be held until he was eighteen years old. He testified that no one had pressured him into testifying. He said that he came forward because he "started

dreaming about it" and that he had been thinking about coming forward for about a year and a half. He further testified that he recalled sitting in the prosecutor's office with Talley and stating that he did not kill Kearney. Epps also denied having a scarf over his face when he shot Kearney. When shown a picture of Kearney's dead body, Epps testified that it did not look like the person he shot. He also admitted that he had denied six or seven times to a detective that he shot the man in the picture.

The trial judge denied Hopkins's motion for a new trial on the ground that the evidence was merely cumulative of evidence adduced at trial and that, in any event, the witnesses were not credible. Hopkins later renewed his motion for a new trial and alleged that the Commonwealth's Attorney had written a letter stating that Hopkins should get a new trial. The trial judge again denied the motion. Hopkins then noted his appeal to this Court.

## III.

A motion for a new trial based on the allegation of after-discovered evidence is not looked upon with favor and is to be granted with great reluctance. *Lewis v. Commonwealth*, 209 Va. 602, 608, 166 S.E.2d 248, 253 (1969). To prevail on the motion, the defendant bears the burden of establishing the following elements:

> that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

*Odum v. Commonwealth*, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983).

There is no dispute that the evidence offered in support of the motion for a new trial was not discovered until after trial. In addition, Hopkins's counsel represented to the trial judge that both he and Hopkins had conducted an extensive investigation of the facts, including traveling to the scene of the crime on several occasions late at night in an effort to attempt to find witnesses who might testify in Hopkins's behalf. We conclude that even with the exer-

cise of reasonable diligence, counsel's investigation could not have been expected to uncover Epps's confession to a murder or the cooperation of Epps's relatives. All of the witnesses expressed their reluctance to disclose information before learning of the conviction. Nothing in the record suggests that efforts by counsel or Hopkins could have brought that information to light earlier. *See Whittington v. Commonwealth*, 5 Va. App. 212, 215, 361 S.E.2d 449, 451-52 (1987) (diligent search would not have found witness absent "unusual good fortune" or interviews with an entire army base).

The trial judge found that Hopkins failed to establish that the evidence was not merely cumulative, corroborative, or collateral. We hold that it was not. "If the witness sought to be impeached is 'the key prosecution witness,' then a new trial should be ordered, assuming all of the other requirements for a new trial are met." *Id.* at 216, 361 S.E.2d at 452 (quoting *State v. Stewart*, 239 S.E.2d 777, 784 (W. Va. 1977)). We cannot agree that the actual confession of Epps, coupled with the corroborative testimony of four other witnesses (two of whom were blood relatives of Epps and another of whom was a blood relative of the deceased victim) can be fairly characterized as "merely cumulative" of Branch's trial testimony.

Although Branch testified at the trial that someone called "Scooby" shot Kearney, he testified that he did not know that person's actual name. Branch provided no information concerning the shooter other than a nickname. Indeed, the evidence at the evidentiary hearing on the motion for a new trial established that Epps was then a resident of Maryland who was visiting his relatives.

Although Epps's confession corroborated Branch's testimony and impeached Talley's, his confession was by its nature highly probative and of a wholly different quality than testimony of a third person implicating Epps. Moreover, that the corroborative witnesses are Epps's friends and relatives is also a factor that weighs heavily in our conclusion.

The trial judge found that the witnesses were not credible. Although the witnesses' failure to report promptly what they knew of the murder to the authorities does not weigh in their favor, we cannot say that their explanations for delay (fear, uncertainty, confusion) or explanations for ultimately coming forward (pangs

of conscience) are incredible as a matter of law. *See Riley v. Harris*, 211 Va. 359, 363, 177 S.E.2d 630, 633 (1970) (a conflicting explanation "is a matter for the jury, unless the explanation is unreasonable as a matter of law, or inherently incredible or such that reasonable men could not differ as to its effect"). The record does not establish that those explanations were such that a reasonable juror would necessarily disbelieve them. *See Hammer v. Commonwealth*, 207 Va. 159, 162, 148 S.E.2d 892, 894 (1966) (prosecutrix's delay in reporting attempted rape did not make her testimony incredible as a matter of law); *Corvin v. Commonwealth*, 13 Va. App. 296, 299, 411 S.E.2d 235, 237 (1991) (victim's "youth, fright, and embarrassment" were acceptable explanation for delay in reporting crime).

The trial judge also found that the accounts of the witnesses in this case suffered from occasional internal inconsistencies and even differed, sometimes materially, from each other. Those conflicts were, however, under the circumstances of this case, for a jury to resolve. In *Hines v. Commonwealth*, 136 Va. 728, 117 S.E. 843 (1923), the accused made a motion for a new trial based on after-discovered evidence that someone else had confessed to the murder for which the accused had been convicted. *Id.* at 735-36, 117 S.E. at 845. The trial judge denied the motion, and the Supreme Court reversed. *Id.* at 751, 117 S.E. at 849-50. In that case, notwithstanding the confessor's death, the Supreme Court stated:

> The jury found upon the original evidence that [Hines] was guilty beyond a reasonable doubt, and as they were the sole judges of the weight and credibility of the testimony, their verdict thereon could not be disturbed. But the vital facts upon which that verdict was based were disputed, and this new evidence, if they had heard and believed it, would necessarily have produced a different result. We do not undertake to say what weight a jury would give to the new evidence, but it certainly ought to change the result if it is worthy of belief, *and whether it is worthy of belief is a question which ought to be settled, not by the court, but by a jury.*

*Id.* at 750-51, 117 S.E. at 849-50 (emphasis added). The trial judge in this case concluded that he did not find the witnesses credible but failed to consider whether a jury could have.

The Commonwealth argues that the trial judge correctly made a credibility analysis and relies upon *Odum v. Commonwealth*, 225 Va. 123, 301 S.E.2d 145 (1983). The Court in *Odum* held that the evidence was not discovered after trial, that the evidence could have been obtained at trial in the exercise of due diligence, and that the same result would occur upon retrial. 225 Va. at 131, 301 S.E.2d at 149. Significantly, the two victims not only identified Odum as the perpetrator at trial but also testified that Odum's brother, the subsequent confessor, who was present at trial, was not the perpetrator. *Id.* at 127, 301 S.E.2d at 147. Because of that testimony, the Court necessarily concluded that the trial judge "properly could find that [the evidence] was not such as should produce opposite results . . . at another trial." *Id.* at 131, 301 S.E.2d at 149. The jury in Odum's first trial had assessed the victim's certainty regarding the identification of Odum in direct contrast to his brother, who was present at trial.

In Hopkins's case, however, the jury had only the opportunity to weigh Talley's identification of Hopkins against the unsupported testimony of a witness that an unknown person named "Scooby" may have been the perpetrator. The jury did not have the opportunity to weigh Talley's testimony that she heard "Squeeky" and saw Hopkins shoot against the witnesses who testified that they heard "Scooby" and saw the confessor Epps shoot. Moreover, the evidence proved Talley had consumed several beers. Because of these factors, *Odum* does not control our decision in this case. We hold that the trial judge abused his discretion in taking from a jury the resolution of the conflicts in the evidence.

If a jury did believe the after-discovered evidence, i.e., that Epps and not Hopkins murdered Kearney, then the outcome necessarily would be different. *Hines* at 750-51, 117 S.E. at 849. *See also Fisher v. Commonwealth*, 11 Va. App. 302, 304-05, 397 S.E.2d 901, 902 (1990) (holding that accused's son's post-conviction testimony contradicted the victim's testimony as to a material fact and merited retrial). Thus, Hopkins met the fourth requirement that the evidence be such that it would likely affect the outcome of a new trial. We hold that Hopkins is entitled to a new trial.

## IV.

Because the issue is likely to arise again on remand, we also decide the question of whether Talley's identification of Hopkins was the product of unduly suggestive identification procedures.

In *Simmons v. United States*, 390 U.S. 377, 384 (1968), the Supreme Court held that unduly suggestive photographic identification procedures denied a defendant due process of law if the procedures were likely to result in misidentification. *See also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). The Supreme Court has identified several factors reviewing courts ought to examine in determining the reliability of a witness's identification, notwithstanding a suggestive identification procedure. These factors are:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Consistent with these cases, this Court has held:

> [T]wo rules of law [regarding the admissibility of in-court and out-of-court identifications] can be discerned [from the guidelines espoused by the U.S. Supreme Court.] The first involves the admissibility of evidence of out-of-court identifications. Such evidence will be admitted if either (a) the identification was not unduly suggestive, or (b) the procedure was unduly suggestive, but the identification is nevertheless so reliable, in accordance with the factors noted in *Biggers* and *Brathwaite* that there is no substantial likelihood of misidentification. Second, even if evidence of the out-of-court identification cannot be admitted, an in-court identification may still be made if the origin of that identification is independent of the inadmissible out-of-court identification procedure.

*Hill v. Commonwealth*, 2 Va. App. 683, 693, 347 S.E.2d 913, 918 (1986).

Hopkins argues that the combination of three factors made the identification procedures in this case unduly suggestive: (1) that police spoke with Talley about Hopkins prior to Talley's out-of-court identification, (2) that Hopkins's picture was the only picture to appear in both photo arrays, and (3) that in both photo arrays Hopkins's picture was the fourth picture of six. We examine each contention in turn.

Talley's testimony regarding whether the police talked to her before the first photo array was inconsistent. Although she said once that a police officer had talked to her before showing her the array, she later testified that the police officer had not talked to her before she made her identification from the photo array. However, viewed in the light most favorable to the Commonwealth, the evidence did not prove that the police spoke with Talley using the name "Hopkins" or mentioned Hopkins's name before her first identification of him from the photo array. The examination of the witness on this point was imprecise. However, she stated that the officer asked her about "Squeeky," the name she had given them. She also said, "I don't know him by Troy Hopkins." On this record, we cannot conclude that Hopkins established that the police questioning was suggestive.

We also conclude that the fact that Hopkins was the only person to be depicted in both pretrial photo arrays did not necessarily make the identification procedure unduly suggestive. Talley viewed the two photo arrays a month apart. Nothing in the record suggests that Talley would have remembered each of the five other photographs from the first array and noted their absence in the second array. *See United States v. Davenport*, 753 F.2d 1460, 1462-63 (9th Cir. 1985) (holding similarly on similar facts). Although an array without Hopkins's photo might have bolstered Talley's credibility if she reported that the person she had seen was not in the array, on this record we cannot say that the decision to include his photograph in the second array was suggestive.

We apply similar reasoning to the placement of the photograph within the array. The fact that Hopkins's photo was on both occasions the fourth photo does not *ipse dixit* prove that it was likely to be suggestive to a witness. We also note that although Hopkins appeared in both arrays at the same position, he was posed and dressed significantly differently in the two photographs. Thus, we cannot conclude that the evidence proved suggestiveness of the

identification procedure.

## V.

For the foregoing reasons, we reverse the judgment of the trial court, and remand for a new trial if the Commonwealth be so advised, and for proceedings consistent with this opinion.

*Reversed and remanded.*

Barrow, J., concurred.

Cole, S.J., dissenting.

The majority neither correctly states nor applies Virginia law. A motion to set aside a jury verdict on the grounds of after-discovered evidence is addressed to the sound discretion of the trial judge, who has seen and heard the witnesses. The majority eliminates all discretion in the trial judge to weigh conflicting evidence and requires him to grant a new trial when the after-discovered evidence conflicts with the evidence presented during the trial. I do not agree with this view.

The leading case in Virginia on after-discovered evidence is *Odum v. Commonwealth*, 225 Va. 123, 301 S.E.2d 145 (1983). It holds that the defendant bears the burden of establishing that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of due diligence by the movant; (3) is not merely cumulative, corroborative, or collateral; and (4) is material and such as should produce an opposite result on the merits at another trial. *Id.* at 130, 301 S.E.2d at 149. I will only address the fourth criterion.

The sole issue considered by the Supreme Court in *Odum* was "whether the trial court erred in refusing to grant defendant's motion for a new trial based on after-discovered evidence." *Id.* at 125, 301 S.E.2d at 146. The facts in *Odum* are strikingly similar to the facts in this case. A truck driver attempted to run down two persons on a motorcycle. At trial, the central issue was the accuracy of the identification of the defendant, Randy Lee Odum. Both victims identified him as the driver of the truck. In spite of Randy Odum's denial that he was the driver of the truck, he was convicted.

After the conviction, Randy Odum filed a motion for a new trial on the ground that newly-discovered evidence had become available since the trial in that his brother, Fred Odum, who owned the truck, confessed to the police that he was the only person who drove the truck on the relevant date and that he drove the truck at the time and place of the assault. The trial court refused to grant a new trial based upon the evidence. The Supreme Court applied the fourth criterion to the evidence produced at trial and upon the motion and stated:

> [W]hile the evidence, if believed, was material, *the trial court, assessing the credibility of defendant's witnesses both at trial and at the motion hearing,* properly could find that it was not such as would produce opposite results on the merits at another trial. At a future trial, the contents of Odum's "confession" would be only the latest in a series of inconsistent statements. *More importantly, the trial court was justified in concluding that because of the positive, largely unimpeached identification of defendant by the victims, the same results would occur upon retrial.*

*Id.* at 131, 301 S.E.2d at 149 (emphasis added).

Many of our sister states have had occasion to rule upon the same issue. In *People v. Penoyer*, 135 A.D.2d 42, 523 N.Y.S.2d 672, *aff'd*, 72 N.Y.2d 936, 529 N.E.2d 173, 532 N.Y.S.2d 843 (1988), the defendant was convicted of vehicular homicide after a head-on collision. The conviction was based upon the location of the cars and testimony from an accident reconstruction expert. At trial, there was no eyewitness testimony. After the conviction, an eyewitness came forward "after reading accounts in the newspaper of the trial and the respective contentions of the People and the defendant as to how the accident occurred." *Id.* at 43-44, 523 N.Y.S.2d at 673. After a two day hearing on a motion for a new trial, the trial court denied the motion and "unequivocally found the newly discovered evidence [the new and only eyewitness] to be unbelievable, hence unlikely to change the trial's result." On review, the appellate court observed:

> [The trial court] had the considerable benefit of observing [the new witness's] demeanor and heard and saw the evidence underlying the jury's guilty verdict. This is no small

advantage and it is precisely why the court's evaluation of the witness's credibility must be given great deference.

*Id. See also McMillian v. State*, 594 So. 2d 1253 (Ala. Crim. App. 1991) (holding that the trial court is the fact finder and a condition to the granting of a new trial based on newly-discovered evidence is that the trial court believe the new evidence presented); *Love v. State*, 799 P.2d 1343 (Alaska Ct. App. 1990) (holding that the trial judge was required to decide the probable impact of newly-discovered evidence based on his view of its credibility); *Fisher v. State*, 33 Conn. App. 122, 634 A.2d 1177 (1993) (holding that in determining the potential impact of new evidence, the trial court must weigh that evidence in conjunction with the evidence presented at the original trial and within its discretion, upon examination of all the evidence, decide whether the petitioner established substantial grounds for a new trial); *People v. Lawson*, 232 Ill. App. 3d 284, 596 N.E.2d 1235, *cert. denied*, 602 N.E.2d 465 (1992) (holding that a determination of the credibility of a recanting witness lies within the discretionary authority of the trial judge); *Nunn v. State*, 601 N.E.2d 334 (Ind. 1992) (holding that in determining whether evidence would produce a different result upon a new trial, the trial court may consider the weight that a reasonable trier of fact would give it and may evaluate the probable impact the evidence would have in a new trial considering the facts and circumstances shown at the original trial); *State v. Estrada*, 537 A.2d 983, 986 (R.I. 1988) (holding that when making his assessment whether to grant a new trial, the trial justice must exercise his independent judgment about the credibility of the witnesses and the weight to ascribe to their testimony); *Ross v. State*, 861 S.W.2d 64 (Tex. Ct. App. 1993) (holding that it is axiomatic that the credibility of witnesses is left to the determination of the trial court in a motion for a new trial); *State v. King*, 313 S.E.2d 440 (W. Va. 1984) (holding that a confession by another person after trial does not invariably require a new trial; the integrity of the confession is for the trial court to judge).

Several findings were made by the majority in their opinion. It admits that the trial judge found that the testimony of the appellant's witnesses in this case suffered from occasional inconsistencies and even differed, sometimes materially, from each other, yet it concludes that the conflicts were for a jury to resolve. The

import of this finding is that whenever the after-discovered evidence conflicts with the trial evidence, a new trial must be granted in order to permit a jury to resolve the conflicts. This means that the trial judge has no discretion to resolve the credibility of witnesses and must, in every such case, grant the request for a new trial. The majority admitted that the trial judge did not find the appellant's witnesses credible, yet it found that he failed to consider whether a jury could have. Does the majority mean, as it said, that the conflict in the evidence was to be resolved by a jury, or does it mean, as it said, that the trial judge is to consider what a jury would do? It is obvious from a reading of the opinion as a whole, the majority means that a conflict between the trial evidence and the newly-discovered evidence must be resolved by a jury in a new trial.

The majority also states:

> [T]he jury had only the opportunity to weigh Talley's identification of Hopkins against the unsupported testimony of a witness that an unknown person named "Scooby" may have been the perpetrator. The jury did not have the opportunity to weigh whether to believe Talley's testimony that she heard the name "Squeeky" and saw [appellant] shoot the victim, or whether to believe the witnesses who testified at the post-trial hearing that they heard the name "Scooby" and saw the confessor [Adrian] Epps shoot . . . . Because of these factors, *Odum* does not control our decision in this case. We hold that the trial judge abused his discretion in taking from a jury the resolution of the conflicts in the evidence.

> If a jury did believe the after-discovered evidence, i.e., that Epps, and not Hopkins, murdered Kearney, then the outcome necessarily would be different. . . . Thus, Hopkins met the fourth requirement that the evidence be such that it would likely affect the outcome at a new trial. We hold that Hopkins is entitled to a new trial.

Under this holding, the majority concludes that when there is a conflict between the evidence presented at trial and the evidence presented upon the motion for a new trial based upon after-discovered evidence, the trial judge has no discretion to weigh the evidence and resolve the conflicts. His only option would be to grant the motion for a new trial and empanel a jury to retry the case in

order that the conflicts be resolved.

The trial judge gave the appellant every opportunity to prove that a new trial should produce opposite results on the merits. He held three separate hearings to permit appellant to present all the evidence. He wrote a letter opinion outlining the evidence produced at trial, the evidence produced at the motion hearings, and the inconsistencies among the witnesses. He concluded that the credibility of the appellant's witnesses had been repeatedly impeached, "in that no two witness[es] has told the same story. . . . These witnesses are so unbelievable that the court does not feel that a different result would occur at another trial."

On December 20, 1990, the appellant's trial was held for the robbery and killing of Curtis Kearney at approximately 4:00 a.m. on July 21, 1990. All the witnesses agreed that the shooting occurred under a street light making the scene highly visible despite the late hour. The prosecution's chief witness, Janice Talley, positively identified the appellant as the person who committed the slaying in open court and during photo spread lineups conducted on two separate occasions. After the homicide, Talley spoke with the first officer who arrived on the scene and told him that the perpetrator had been called by the name "Squeeky." Later, that same morning, she spoke with Detective Quick and gave him a specific description of the man she saw shoot Kearney. Because Talley was so close to Kearney when he was shot, she was able to describe the perpetrator's clothes, his size, weight, hair length, and approximate age. She stated to Quick that the gunman had a gold tooth in the front right side of his mouth. Troy Hopkins precisely fit the description.

The officers were able to obtain the identity of the appellant because of his nickname, "Squeeky." Afterwards, two photo spreads were shown to Talley, one month apart. In both, she picked out the appellant as the man who shot Kearney. She stated that her identification was based upon her recollection of him on the night of the murder. She positively identified him at trial.

The appellant presented an alibi defense and called three witnesses to testify: his employer, his girlfriend, and his long-time friend, James Branch. The girlfriend testified that she and appellant spent a quiet evening at home, some ten miles away from the murder, and he never left her presence that night. His employer

testified that the day after the shooting, the appellant was at work and worked the entire day. James Branch testified at trial that "Scooby," not "Squeeky," committed the murder. Branch stated that Adrian Epps, known as "Scooby," shot Kearney, and that Hopkins was not on the street that night.

The after-discovered evidence (new evidence) produced by the appellant at the third and final hearing held on July 30, 1992, consisted of the testimony of five witnesses: William Wilson; Marvin Robinson; Melvin Hawkins; Charmane Kearney; and Adrian Epps. All of these new witnesses waited at least one year from the time of the murder before coming forward. None of them reported their information to the authorities prior to appellant's conviction. William Wilson testified that he was thirty-five to forty feet away from the location of the shooting. Although he did not see the shooting, he did not see appellant at the scene. Marvin Robinson was not at the crime scene and only knew what others told him. The three remaining witnesses testified they were present at the crime scene, but they gave inconsistent and conflicting testimony. I will point out some of the major conflicts to show what led the trial judge to conclude that their testimony was unbelievable and should not result in an opposite result if a new trial were awarded.

The majority concludes that Adrian Epps's confession was, by its nature, highly probative and of a different quality than testimony of the other persons implicating Epps. I take it that the majority considers Epps's testimony the best evidence it has. Therefore, I will consider his testimony first. At the hearing held on February 26, 1991 (the second hearing), Epps testified under oath that he was present at the crime scene with Melvin Hawkins and George Epps, that the three of them were standing in the crowd, that he did not see the shooting take place, and that he was not involved in any way with the shooting of Kearney. He testified that he had no gold in his teeth. Later, at the hearing on July 30, 1992, Epps testified under oath that he was at the crime scene with Melvin Hawkins. They were standing among the crowd, and Curtis Kearney and a lady came down the street. Melvin Hawkins walked up to Kearney, and they talked. Epps walked up to Kearney and asked for a cigarette. They had a few words, and, because Kearney looked like he was reaching for a gun, Epps shot him. According to Epps, after the shooting, he threw the gun in a creek. Epps testified that he was fourteen years old at the time of

the shooting and that he had been advised that if he were prosecuted for murder, he could only be held until he was eighteen years old. At the time of the hearing, Epps was sixteen years old.

Shortly before the July 30, 1992 (third) hearing on the motion for a new trial, the police showed Epps a photograph of the victim, Kearney, taken at the crime scene. Epps stated that the person in the photograph did not look like the person he shot. Six or seven times, he denied to the police that the victim in the photograph was the man he shot. On July 30, 1992, during redirect examination, Epps testified under oath that the man in the photograph (Kearney) did not look like the man he shot. The trial judge observed the demeanor of Epps while on the witness stand at the hearing on February 26, 1991, (the second hearing) and at the hearing on July 30, 1992, (the third hearing), and he had every right to conclude that Epps, who committed perjury before him, was totally unreliable.

At the hearing on July 30, 1992, Melvin Hawkins testified that he was at the murder scene with Adrian Epps getting drunk, and the victim, Kearney, approached him and, contrary to the testimony of Epps, asked for some "works" (hypodermic syringe and needle to inject drugs). Earlier in the day, according to Hawkins, Kearney had purchased cocaine from him and wanted a needle to inject it. Hawkins testified that Kearney got upset and that Epps shot Kearney "because he [Kearney] was about to hit me [Hawkins]." According to Hawkins, after the shooting, Epps tossed the gun to him, and he (Hawkins) threw it on a roof.

The testimony of Hawkins is significantly contrary to the testimony of Epps. Both witnesses have different versions of what actually occurred on the night of the shooting including what happened to the murder weapon.

Hawkins was asked what the victim was wearing at the time of the shooting. He testified that the victim was wearing a gray work uniform and gray cap. A photograph of the victim taken by the police at the crime scene showed that the victim wore blue pants, a white shirt, and a black hat.

Charmane Kearney testified that she was present at the murder scene. She knew Adrian Epps and had known him since they were in the fifth grade together. She testified that she saw Hawkins,

Adrian, and a couple of other boys walk up to Kearney and the lady who had gotten out of the car. She heard Adrian say, "I will kill you." When the victim responded that he had no money, Adrian pulled out a gun and shot him. She was asked to describe what Adrian was wearing, and she positively stated that he wore all black. Hawkins testified that Adrian wore burgundy pants, black Reebok shoes, a "Raiders" cap pulled down to his eyebrows, and a towel wrapped around his face. Hawkins said that Adrian wore this attire all day. When Adrian was asked what he was wearing at the time of the shooting, he testified, "black and black and burgundy or gray or one of them."

In addition to these manifest inconsistencies, numerous other inconsistent statements were made by the appellant's witnesses. All of their statements were inconsistent with the positive, timely, and unequivocal testimony of Janice Talley.

Talley was recalled as a witness by the Commonwealth. She personally observed Adrian Epps in the courtroom and testified that he was not the person who shot Kearney. The evidence, including photographs, establish that Hopkins has a gold tooth in the upper right part of his mouth and Adrian Epps does not. Counsel agreed and photographs confirmed that Hopkins and Epps do not resemble one another. When faced with these contradictions and inconsistencies between the testimony of the witnesses, the trial judge concluded that none of the appellant's witnesses were reliable. Accordingly, he denied the motion for a new trial based upon after-discovered evidence. The trial judge recognized both his right and duty to weigh the credibility of the witnesses upon such a motion. The trial judge found that the "new" witnesses were so unbelievable that a different result would not obtain upon a retrial of the case.

The trial judge compared the evidence produced at trial with what the appellant contended could have been presented had he been granted a new trial. He was justified in considering the strength of the testimony of Janice Talley and in recalling that the alibi testimony of appellant's witnesses, Kathy Blunt and James Branch, was rejected by the jury. He was entitled to weigh the credibility of the appellant's witnesses at the motion for a new trial. *See Mundy v. Commonwealth*, 11 Va. App. 461, 481-82, 390 S.E.2d 525, 536, *aff'd en banc*, 399 S.E.2d 29 (1990), *cert. denied*, 502 U.S. 840 (1991); *Odum*, 225 Va. at 131, 301 S.E.2d

at 149. "The issue of the [witness's] credibility and the weight to be given her testimony was one for the trial court to resolve, and the trial court's findings will not be reversed on appeal unless plainly wrong or without evidence to support them." *Wyatt v. Virginia Dep't of Social Servs.*, 11 Va. App. 225, 230, 397 S.E.2d 412, 415 (1990). "In testing the credibility and weight to be ascribed to the evidence, we must give the trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them." *Swanson v. Commonwealth*, 8 Va. App. 376, 379, 382 S.E.2d 258, 259 (1989). The credibility of witnesses is a matter for the fact finder to decide, weighing such factors as the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and observing the things about which they testify, their interest in the outcome of the case, their bias, and, if any, their prior inconsistent statements and/or their prior criminal convictions. *Mullis v. Commonwealth*, 3 Va. App. 564, 571, 351 S.E.2d 919, 923 (1987). " 'The finding of the judge, upon the credibility of the witnesses and the weight to be given their evidence, stands on the same footing as the verdict of a jury, and unless that finding is plainly wrong, or without evidence to support it, it cannot be disturbed.' " *Yates v. Commonwealth*, 4 Va. App. 140, 143, 355 S.E.2d 14, 16 (1987) (quoting *Lane v. Commonwealth*, 184 Va. 603, 611, 35 S.E.2d 749, 753 (1945)).

The fact finder is entitled to accept the evidence of one witness and to reject that of the defendant. The uncorroborated testimony of one witness may be sufficient to sustain a verdict of guilty. *Bryant v. Commonwealth*, 10 Va. App. 421, 427, 393 S.E.2d 216, 220 (1990). He has the right to reject that part of the evidence believed by him to be untrue and to accept that found by him to be true. *Delacruz v. Commonwealth*, 11 Va. App. 335, 338-39, 398 S.E.2d 103, 105 (1990).

The central issue at trial was the accuracy of the identification of the appellant as the perpetrator of the murder. An eyewitness standing six feet away testified that appellant shot Kearney. Her testimony was corroborated by two photo spread identifications a month apart. She identified the gold front tooth of the appellant and the fact that the assailant used a .32 caliber gun. Immediately after the shooting she correctly gave the police his description by age, weight, height, complexion, hair, and dress. She testified that

he was called "Squeeky." Only a soothsayer would have been able to predict all of these facts if she were not present to witness the shooting. The jury rejected the alibi testimony of both Blunt and Branch at trial. The evidence at trial was certainly sufficient to support appellant's conviction beyond a reasonable doubt. After hearing the testimony on the motion for a new trial, the trial judge found the appellant's witnesses unbelievable because of the many inconsistent statements made by them. Notable among the inconsistencies was the glaring conflict between the testimony of Janice Talley and the testimony of appellant's witnesses. The appellant's witnesses were clear about only two things: "Scooby" did the shooting and appellant was not at the crime scene. Beyond those two facts, the appellant's witnesses did not know any of the details of the events of the night because they were not there. The jury rejected the testimony from Kathy Blunt and James Branch. The trial judge rejected the testimony of the others. There is ample evidence in the record to support the finding of the trial judge. The only way for the appellant to prove that the trial judge abused his discretion was to establish that his ruling was plainly wrong or without evidence to support it. This he has not done.

The majority holds that *Odum*, a case precisely on point, is not controlling. Instead, it appears to rely on *Hines v. Commonwealth*, 136 Va. 728, 117 S.E. 843 (1923), a case not on point. In *Hines*, the defendant was convicted of second degree murder "purely [on] *circumstantial evidence.*" *Id.* at 740, 117 S.E. at 846 (emphasis added). He made a motion for a new trial based upon after-discovered evidence. The alleged "new evidence" tended to show that Curtis Jenkins, a third party, owned a cap similar to the one found at the crime scene, owned a gun similar to the murder weapon, had a motive and opportunity to kill the victim, and admitted to several persons that he, and not the accused, had committed the crime. Jenkins died after the trial and before the hearing on the motion; therefore, he was not available to testify and be cross-examined. Under rules of evidence in effect at the time, testimony relating to the confessions and admissions by third parties was not admissible in criminal trials for the purpose of exonerating an accused. In *Hines*, the trial judge followed the majority view and refused to grant a new trial on the basis of this after-discovered evidence. He declared the testimony would be inadmissible in a new trial and, therefore, would not have produced a different result.

The Supreme Court explained that, "So far as the confessions of Curtis Jenkins are concerned, the learned and upright judge who tried the case followed the almost unbroken current of authority." *Id.* at 750, 117 S.E. at 849.

The Court then changed the evidentiary rule that had excluded the defendant's evidence. The Court stated that under such circumstances the "accused ought not to have been deprived of the benefit of them before the jury." *Id.* The Court stated that "as our decision here must be regarded as out of line with the current of authority, we will expressly limit its effect as a precedent in this court to the particular facts of the case in hand." *Id.* at 747, 117 S.E. at 848. The *Hines* decision pertains to the admissibility of evidence in the trial court and does not declare that a jury must make credibility determinations of any new, after-discovered evidence that conflicts with the evidence at trial, as contended by the majority in this case. Credibility of witnesses was not an issue in *Hines*. Admissibility of evidence was.

Because the trial judge properly exercised his discretion in assessing the credibility of the witnesses's newly-discovered evidence and found their credibility lacking such that a different result would not be achieved at a new trial, I cannot find that his holding was plainly wrong or without evidence to support it. Accordingly, I respectfully dissent.