456 S.E.2d 147

**Troy D. HOPKINS**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0110–93–2.**

Court of Appeals of Virginia,
Richmond.

April 18, 1995.

Benton, J., filed dissenting opinion in which Barrow, J., joined.

Arnold R. Henderson, Richmond (Wilder & Gregory, on brief), for appellant.

Richard B. Smith, Asst. Atty. Gen. (James S. Gilmore, III, Atty. Gen., on brief), for appellee.

Present: MOON, C.J., and BAKER, BARROW*, BENTON, COLEMAN, KOONTZ, WILLIS, ELDER and FITZPATRICK, JJ.

## UPON REHEARING EN BANC

WILLIS, Judge.

On appeal from his convictions of first degree murder, attempted robbery, use of a firearm in the commission of murder, and use of a firearm in the commission of attempted robbery, Troy D. Hopkins contends that the trial court erred (1) in denying his motion for a new trial based on after-discovered evidence, and (2) in receiving into evidence an eyewitness's identification that Hopkins contends resulted from undue suggestion.

On September 6, 1994, a panel of this Court held that the trial court did not err in admitting the eyewitness identification into evidence, but reversed and remanded Hopkins's convictions on the new trial issue. *See Hopkins v. Commonwealth,* 19 Va.App. 1, 448 S.E.2d 316 (1994). We granted the Commonwealth's petition for rehearing *en banc* and stayed the September 6, 1994 mandate. Upon rehearing *en banc,* we affirm the judgment of the trial court and vacate the September 6, 1994 mandate.

---

* Judge Barrow participated in the hearing and decision of this case prior to his death on March 28, 1995.

I.

On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

*Josephs v. Commonwealth,* 10 Va.App. 87, 99, 390 S.E.2d 491, 497 (1990) (*en banc*). This standard governs our review of the trial judge's rulings.

Janice Talley testified that on July 21, 1990, at about 4:00 a.m., she and Curtis Kearney went to a location on Afton Avenue in Richmond. Kearney got out of their automobile and she followed at a distance of about six feet. A person with a red mask on his face approached Kearney with a gun and demanded money. That person shot and killed Kearney with what Ms. Talley recognized and identified as a .32 caliber handgun. The mask fell off the assailant's face and she heard him say, "Curtis—I just shot Curtis." She ran back to her car. When the police arrived, Ms. Talley reported, "I heard— I heard the name, Squeeky, before . . . the thing came off his face. I heard, 'Squeeky, why did you shoot that man?' " Although she had never seen the assailant before, she described him to the police as "about 5′5″ or 5′6″, . . . weighed about 130 pounds, . . . had short hair, and . . . he happened to have gold teeth in his mouth, up in his right side." She reported that he was wearing blue jeans and a blue striped shirt.

About a month after the incident, Ms. Talley selected a photograph of Hopkins from an array of six photographs. A month later, shown another array of six photographs, she again picked a photograph of Hopkins. In the courtroom, she identified Hopkins as the assailant.

Officer Bohannon testified that when he arrived at the scene of the shooting, Ms. Talley told him that a person named "Squeeky" had shot Kearney. Detective Quick testified that

Ms. Talley described the assailant as follows: "Black, male, dark skinned, young looking, 15 to 16, 5'6", 130 pounds, possibly a gold tooth on the upper side.... He had a red scarf over the lower part of his face, which he removed at one point, and then a white shirt with blue stripes, and blue jeans." Detective Quick further testified that Ms. Talley reported that someone had called the assailant "Squeeky." He described her identification of Hopkins from the two photographic arrays.

James Branch testified in Hopkins's defense. He said that Kearney asked him for drugs, and that as Kearney walked away, three boys approached him. One of the three, a fifteen year old about five feet, two inches tall, light skinned, and known as "Scooby" shot Kearney. He denied that either Ms. Talley or Hopkins was present. He testified that Hopkins did not shoot Kearney. He admitted that he told no one of "Scooby's" involvement until he learned that Hopkins had been accused.

Hopkins did not testify. The jury convicted him on all charges.

Hopkins moved for a new trial, alleging after-discovered evidence. He submitted affidavits identifying Adrian Epps, known also as "Scooby," as the murderer. After an evidentiary hearing, the trial court denied the motion. The transcript of that hearing was not timely filed. Upon appeal, this Court remanded the case to the trial court for reconsideration of the new trial motion. On July 30, 1992, the trial court again heard and denied the new trial motion. This appeal addresses that denial.

At the July 30, 1992 hearing, Hopkins produced five witnesses: William Wilson, Marvin Robinson, Melvin Hawkins, Charmane Kearney, and Adrian Epps. These witnesses all waited at least one year from the time of the murder before coming forward. None reported any information to the police prior to Hopkins's conviction.

William Wilson testified that he was thirty-five to forty feet away from the location of the shooting. Although he did not see the shooting, he did not see Hopkins at the scene.

Marvin Robinson testified that he was not at the crime scene and knew only what others had told him.

Adrian Epps testified that he was at the crime scene with Melvin Hawkins. He said that Curtis Kearney and a lady came down the street, Melvin Hawkins walked up to Kearney, and they talked. Epps said that he walked up to Kearney and asked for a cigarette. They had a few words, and, because Kearney looked as though he was reaching for a gun, Epps shot him. Epps testified that after the shooting, he threw the gun in a creek. He testified that he was fourteen years old at the time of the shooting and that he had been advised that if he were prosecuted for murder, he could be held only until he was eighteen years old. At the time of the hearing, Epps was sixteen years old. He testified that he had no gold in his teeth.

At the February 26, 1991 hearing, Epps testified under oath that he was present at the crime scene with Melvin Hawkins and George Epps, that the three of them were standing in the crowd, that he did not see the shooting take place, and that he was not involved in any way with the shooting.

Shortly before the July 30, 1992 hearing, the police showed Epps a photograph of the victim, Kearney, taken at the crime scene. Epps stated that the person in the photograph did not look like the person he had shot. Six or seven times, he denied to the police that the victim in the photograph was the man he had shot. At the July 30, 1992 hearing, during redirect examination, Epps testified that the man in the photograph (Kearney) did not look like the man he had shot. The trial court observed Epps's demeanor on the witness stand at the February 26, 1991 hearing and at the July 30, 1992 hearing. It concluded that Epps, who, at one time or the other, had committed perjury, was incredible.

Melvin Hawkins testified that he was at the murder scene, getting drunk with Adrian Epps. Kearney approached him

and (contrary to Epps's testimony) asked for some "works" (hypodermic syringe and needle to inject drugs). According to Hawkins, Kearney had purchased cocaine from him earlier and wanted a needle to inject it. Hawkins testified that Kearney became upset and that Epps shot Kearney "because [Kearney] was about to hit [Hawkins]." Hawkins said that after the shooting, Epps tossed the gun to him, and he (Hawkins) threw it on a roof.

Hawkins testified that Kearney was wearing a gray work uniform and gray cap. A photograph of Kearney, taken by the police at the crime scene, showed that he wore blue pants, a white shirt, and a black hat. Hawkins's testimony significantly contradicted Epps's. They gave different versions of what happened on the night of the shooting, including the disposition of the murder weapon.

Charmane Kearney testified that she had known Adrian Epps since they were in the fifth grade. She testified that she saw Hawkins, Epps, and a couple of other young men walk up to Kearney and the lady who had gotten out of the car. She heard Epps say, "I will kill you." She testified that when Kearney said that he had no money, Epps pulled out a gun and shot him.

Asked to describe what Epps was wearing, Ms. Kearney testified that he wore all black. Hawkins testified that Epps wore burgundy pants, black Reebok shoes, a "Raiders" cap pulled down to his eyebrows, and a towel wrapped around his face. Hawkins testified that Epps had worn this attire all day. When asked what he was wearing at the time of the shooting, Epps testified, "black and black and burgundy or gray or one of them."

Recalled as a witness by the Commonwealth, Janice Talley observed Adrian Epps in the courtroom and testified that he was not the person who shot Kearney. The evidence, including photographs, established that Hopkins has a gold tooth in the upper right part of his mouth and that Epps does not. Counsel agree that photographs confirmed that Hopkins and Epps do not resemble each other.

The trial court found Hopkins's witnesses incredible and ruled that their testimony was so unreliable that it would not produce a different result upon retrial. Accordingly, it denied the motion for a new trial.

## II.

Motions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance.... The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

*Stockton v. Commonwealth,* 227 Va. 124, 149, 314 S.E.2d 371, 387, *cert. denied,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984).

None of the five witnesses called by Hopkins in support of his motion for a new trial came forward until after Hopkins's trial. The record contains no basis for concluding that their testimony could have been secured for trial through the exercise of due diligence. While their testimony might be deemed cumulative of the testimony given by James Branch at the trial, the controlling issue before us is whether the trial court erred in ruling that their testimony was so incredible that it should not produce an opposite result on the merits at another trial. We hold that the record supports the trial court's ruling.

Of the five witnesses called by Hopkins in support of his motion, two, William Wilson and Marvin Robinson, gave no testimony of any material value.

Adrian Epps, who confessed the shooting at the hearing on appeal, had denied the shooting under oath at a prior hearing, and thus had committed perjury. Furthermore, at the hear-

ing on appeal, Epps repeatedly denied that Kearney was the person he had shot.

Epps testified that he fired because the man he shot appeared to be drawing a gun. Melvin Hawkins testified that Epps fired because the victim was about to strike him (Hawkins). Epps and Hawkins gave conflicting accounts of the disposition of the murder weapon.

Epps, Hawkins, and Charmane Kearney gave conflicting descriptions of Epps's attire at the time of the crime.

At the hearing on Hopkins's motion for a new trial, Janice Talley reaffirmed her identification of Hopkins as the killer and, viewing Epps, specifically denied that he was the killer. Hopkins had a gold tooth. Epps did not. The evidence established that Hopkins and Epps did not resemble each other.

The foregoing circumstances fully support the trial court's conclusion that the witnesses called by Hopkins were unworthy of belief and that their testimony was not such as should produce an opposite result on the merits at a new trial. This assessment lay within the sound discretion of the trial court. *Id.* We find no abuse of that discretion.

In its decision, the panel majority relied upon *Hines v. Commonwealth,* 136 Va. 728, 117 S.E. 843 (1923). We find *Hines* to be distinguishable from the case at bar. In *Hines,* no eyewitness observed the commission of the crime. The conviction was based altogether on circumstantial evidence. The after-discovered evidence, upon which the Supreme Court ruled a new trial should have been awarded, involved not only a third party confession, but also undisputed testimony that a man resembling the third party was seen running from the crime scene, that a cap found at the crime scene resembled one known to belong to the third party, and that the third party was known to carry a weapon of the type involved in the crime. The Supreme Court said:

> If this were a case in which we could say that the evidence as actually introduced was conclusive of the guilt of the accused, then we could ignore the after-discovered evidence.

The jury found upon the original evidence that he was guilty beyond a reasonable doubt, and as they were the sole judges of the weight and credibility of the testimony, their verdict thereon could not be disturbed. But the vital facts upon which that verdict was based were disputed, and this new evidence, if they heard and believed it, would necessarily have produced a different result. We do not undertake to say what weight a jury would give to the new evidence, but it certainly ought to change the result if it is worthy of belief, and whether it is worthy of belief is a question which ought to be settled, not by the court, but by a jury.

*Id.* at 750–51, 117 S.E. at 849–50. This holding, while acknowledging the sufficiency of the evidence to support the jury's verdict, recognized as well the vulnerability of that circumstantial evidence to question and the arguable sufficiency of the after-discovered evidence to support a contrary decision.

Unlike *Hines*, this case presents a verdict based on uncontradicted, corroborated, and reaffirmed eyewitness testimony. Unlike *Hines*, this case presents after-discovered evidence that is self-contradictory, perjured at least in part, and plainly unworthy of belief. That testimony is insufficient, as a matter of law, to frame a legitimate question for jury determination. Therefore, we hold that the evidence "as actually introduced was conclusive of [Hopkins's] guilt." *Id.*

On point with our holding is *Odum v. Commonwealth*, 225 Va. 123, 301 S.E.2d 145 (1983). In *Odum*, the victims identified the defendant as the perpetrator of the crimes against them and denied that the crimes had been committed by his brother, who appeared at trial. At the hearing on a motion for a new trial, the defendant's mother testified that the defendant's brother had confessed the crimes to her shortly after their commission. The brother acknowledged his guilt. The defendant and his brother resembled each other. At the hearing, the victims reaffirmed their identification of the defendant as the culprit, and, testifying that they could distinguish between the two men, reaffirmed their denial that the crimes had been committed by the brother. Affirming the

trial court's denial of the motion for a new trial, the Supreme Court said:

> [W]hile the evidence, if believed, was material, the trial court, assessing the credibility of defendant's witnesses both at trial and at the motion hearing, properly could find that it was not such as should produce opposite results on the merits at another trial. At a future trial, the contents of [the brother's] "confession" would be only the latest in a series of inconsistent statements. More importantly, the trial court was justified in concluding that because of the positive, credible, largely unimpeached identification of defendant by the victims, the same results would occur upon retrial.

*Id.* at 131, 301 S.E.2d at 149. *See also Payne v. Commonwealth,* 233 Va. 460, 472, 357 S.E.2d 500, 507–08 (1987); *Mundy v. Commonwealth,* 11 Va.App. 461, 484–85, 390 S.E.2d 525, 538 (1990) (*en banc*).

## III.

■ Janice Talley identified as pictures of the perpetrator of the crimes two different photographs of Hopkins, contained in two separate photographic lineups conducted a month apart. The record discloses that she made those identifications without hesitation. Furthermore, she identified Hopkins personally in open court. The record discloses nothing suggestive about the composition of the photographic lineups or the manner in which they were displayed to Ms. Talley. She had a good opportunity to observe the perpetrator at the time the crimes were committed. She promptly gave a detailed description of the perpetrator to the police. Hopkins fit that description. We find no error in the trial court's receipt of her identifications into evidence. *See Hill v. Commonwealth,* 2 Va.App. 683, 347 S.E.2d 913 (1986); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

The judgment of the trial court is affirmed.

*Affirmed.*

BENTON, J., joined by BARROW, J., dissenting.

For the reasons stated in the panel's decision reversing the trial judge's denial of Hopkins's motion for a new trial, *see Hopkins v. Commonwealth*, 19 Va.App. 1, 448 S.E.2d 316 (1994), and for the reasons as further stated in this opinion, I would hold that the trial judge erred in refusing to grant a new trial.

Hopkins was convicted of murder upon the testimony of Janice Talley. Talley testified that at 4:20 a.m. she drove Curtis Kearney to a city street where illegal narcotics are sold. She testified that when Kearney got out of her automobile, she decided to follow him. She said that she parked her automobile and followed him "to see what . . . he was up to." According to Talley, she did not know where Kearney was going, but she knew Afton Avenue was "a terrible place to go."

Talley and Kearney had been drinking beers before she drove Kearney to that area. Kearney's blood alcohol concentration was .24 percent. Talley testified that she had consumed only four or five beers. She testified that the person who shot Kearney was six feet away from her and appeared to be fifteen or sixteen years of age. She testified that Hopkins, who was twenty-three years of age, was the shooter.

At the evidentiary hearing on Hopkins's motion for a new trial, Adrian Epps confessed to killing Curtis Kearney. Epps's confession was supported by other witnesses, including Epps's own relatives and Kearney's niece, who testified that they witnessed the shooting. None of these witnesses testified at trial.

Although the trial judge said he did not believe Epps and the other witnesses, the record does not establish that their testimony was incredible as a matter of law. Epps's confession was by its nature highly probative. His self-incriminating confession is of a wholly different quality than would be the testimony of a third person implicating Epps. Moreover, that the corroborative witnesses who implicated Epps include Epps's relatives is also a factor highly probative of whether the testimony was incredible as a matter of law. Also strong-

ly negating a conclusion that the testimony was incredible as a matter of law is the testimony of the victim's niece, who also implicated Epps.

Although the witnesses' failure to report promptly to the authorities what they knew of the murder weighs against their credibility, the record does not establish that their explanations for delay (fear, uncertainty, confusion) or explanations for ultimately coming forward (pangs of conscience) are incredible as a matter of law. *See Riley v. Harris*, 211 Va. 359, 362, 177 S.E.2d 630, 633 (1970) (a conflicting explanation "is a matter for the jury, unless the explanation is unreasonable as a matter of law, or inherently incredible, or such that reasonable men could not differ as to its effect"). The record does not establish that the witnesses's explanations were such that a reasonable juror would necessarily disbelieve them. *See Hammer v. Commonwealth*, 207 Va. 159, 162, 148 S.E.2d 892, 894 (1966) (prosecutrix's delay in reporting attempted rape did not make her testimony incredible as a matter of law); *Corvin v. Commonwealth*, 13 Va.App. 296, 299, 411 S.E.2d 235, 237 (1991) (victim's "youth, fright, and embarrassment" were an acceptable explanation for delay in reporting crime).

Issues concerning the credibility of Epps's confession and the inconsistencies and conflicts in the testimony of the other witnesses were for a jury to resolve. The Supreme Court in *Hines v. Commonwealth*, 136 Va. 728, 117 S.E. 843 (1923), pointedly addressed the concern, raised by the trial judge in this case, that witnesses might be lying:

Unfortunately, as all must concede, witnesses sometimes swear falsely, and it cannot be doubted that alleged confessions of crime by third parties may easily be foisted on the courts and juries, but so may alleged admissions in civil cases, as, for example, regarding the location of a corner tree or other real estate controversy. As to both classes of admissions they must be admitted, if at all, because the evidence itself is important to the ends of justice, and because it may be assumed that no man will speak falsely to his own hurt. The truth of the admission itself, and the credibility of the witness who undertakes to repeat the

admission, must, like the truthfulness of all other testimony, address itself to and be settled by the jury.

*Id.* at 745, 117 S.E. at 848.

In *Hines,* the accused moved for a new trial based on after-discovered evidence that another person had confessed to the murder for which the accused had been convicted. *Id.* at 735–36, 117 S.E. at 845. Notwithstanding the confessor's death, the Supreme Court reversed the trial judge's denial of the motion for a new trial. *Id.* at 751, 117 S.E. at 849–50. Addressing the precise issue that arises in this case, the Supreme Court stated:

> The jury found upon the original evidence that [Hines] was guilty beyond a reasonable doubt, and as they were the sole judges of the weight and credibility of the testimony, their verdict thereon could not be disturbed. But the vital facts upon which that verdict was based were disputed, and this new evidence, if they had heard and believed it, would necessarily have produced a different result. We do not undertake to say what weight a jury would give to the new evidence, but it certainly ought to change the result if it is worthy of belief, *and whether it is worthy of belief is a question which ought to be settled, not by the court, but by a jury.*

*Id.* at 750–51, 117 S.E. at 849–50 (emphasis added). Thus, *Hines* mandates a reversal in this case because the trial judge, as did the judge in *Hines,* found the witnesses's testimony incredible but failed to consider whether a jury might have reached a different result.

The majority instead relies upon *Odum v. Commonwealth,* 225 Va. 123, 301 S.E.2d 145 (1983), to support its conclusion that the trial judge correctly made a credibility analysis based upon his own subjective determination of the credibility of the witnesses. An analysis of *Odum* demonstrates that it turns upon significantly different principles. In affirming the trial judge's refusal to grant Odum a new trial based on evidence that his brother had "confessed," the Supreme Court held that the evidence was not discovered after trial, that the evidence

could have been obtained at trial in the exercise of due diligence, and that the evidence was manifest that the same result would occur upon retrial. 225 Va. at 131, 301 S.E.2d at 149. Any of the three deficiencies was sufficient to bar a new trial. *Id.* at 130, 301 S.E.2d at 149.

In support of its ruling that the trial judge did not err in finding that the same result would occur on Odum's retrial, the Supreme Court did not rely upon the trial judge's own assessment of the witnesses's credibility. Significantly, one of the victims gave extensive testimony at trial explaining why he knew that Odum, not his brother, was the criminal agent. 225 Va. at 127, 301 S.E.2d at 147. The victim testified that he previously had seen Odum's brother, had a "good look" at Odum's brother, and knew that Odum, whose physical characteristics he contrasted with his brother's, was the criminal agent. *Id.* The other victim testified at trial that he had seen Odum's brother in court and had "no doubt" Odum was the criminal agent. *Id.* Thus, the evidence at trial proved that the two victims not only identified Odum as the perpetrator but also testified that Odum's brother, the subsequent "confessor," who was present at trial and subject to scrutiny by the witnesses and the jury, was not the perpetrator. *Id.*

Furthermore, both Odum and his brother testified at the trial. They presented no witnesses to contradict the victims' identification; the two brothers were the only defense witnesses. Odum denied driving the truck the day the assault occurred. His brother testified that he operated the vehicle on the date of the incident but did not know where it was at the time of the incident. *Id.*

Following his conviction, Odum sought a new trial and alleged that his brother had confessed. His brother's "confession" only recited, however, that "he 'cannot say' he did not do it." *Id.* at 130, 301 S.E.2d at 149. At the hearing on the motion, Odum's brother was reluctant to testify because his lawyer was absent. The trial judge then refused to allow him to testify. *Id.* at 129, 301 S.E.2d at 148. Odum's mother

testified that the brothers were sufficiently distinct in appearance that they could not be mistaken for each other. *Id.*

The testimony at the hearing on the motion for a new trial essentially replicated the circumstances proved at Odum's trial. At trial, Odum denied driving the vehicle. Odum's brother testified that he, Odum's brother, had the vehicle the entire day. . Thus, the jury was required to determine whether Odum or his brother was driving the vehicle when the assault occurred. Critical to the jury's decision was the unimpeached testimony of the victims who saw both brothers and told the jury that Odum's brother was not the driver of the vehicle.

The Supreme Court concluded that "because of the positive, credible, largely unimpeached identification of [Odum] by the victims," the trial judge "properly could find that [the evidence] was not such as should produce opposite results ... at another trial." *Id.* at 131, 301 S.E.2d at 149. That finding implicitly recognized that the jury in Odum's trial had assessed the victims' certainty regarding the identification of Odum in direct juxtaposition to the victims' certainty that Odum's brother, who was present at trial, was not the perpetrator. The jury had already considered and rejected precisely the same quality of evidence and the same circumstances of proof that Odum sought to present at a new trial.

In Hopkins's case, however, the jury had only the opportunity to weigh Talley's identification of Hopkins against the unsupported testimony of a witness that an unknown person named "Scooby" may have been the perpetrator. The jury did not have the opportunity to weigh Talley's testimony that she heard "Squeeky" and saw Hopkins shoot against the witnesses who testified that they heard "Scooby" and saw Epps, known as Scooby, shoot.

Moreover, Talley's testimony was contradicted and impeached. The evidence proved Talley had consumed several beers. Because of her consumption of alcohol, her ability to perceive accurately the features of the gunman was at issue at trial. Furthermore, her ability to see in the lighting at 4:30 a.m. is subject to impeachment. In addition, she told the

**258**

police that a 15 or 16 year old boy shot Kearney. In short, her credibility was at issue. With all these shortcomings in Talley's testimony, the ruling to deny Hopkins a new trial would deprive the jury of the opportunity to weigh the testimony of Talley regarding her ability to distinguish Hopkins from Epps. *Odum* does not support such a result. Indeed, it compels a new trial in this case.

If a jury did believe the after-discovered evidence, i.e., that Epps and not Hopkins murdered Kearney, then the outcome necessarily would be different. *Hines,* 136 Va. at 750–51, 117 S.E. at 849. *See also Fisher v. Commonwealth,* 11 Va.App. 302, 304–05, 397 S.E.2d 901, 902 (1990) (holding that accused's son's post-conviction testimony contradicted the victim's testimony as to a material fact and merited retrial). Accordingly, I would hold that the trial judge abused his discretion in taking from a jury the resolution of the conflicts in the evidence, and I would reverse the decision and remand for a new trial.